**Shayne CLAYMORE, Plaintiff and Appellant,**

v.

**Janelle Johnson SERR, Defendant and Appellee.**

No. 15313.

Supreme Court of South Dakota.

Considered on Briefs Jan. 12, 1987.

Decided May 13, 1987.

Al Arendt of Maher & Arendt, Pierre, for plaintiff and appellant.

Patricia A. Meyers of May, Adam, Gerdes & Thompson, Pierre, for defendant and appellee.

WUEST, Chief Justice.

This is an appeal from a decision of the trial court retaining jurisdiction in termination and adoption proceedings involving an Indian child and terminating the parental rights of the father. We affirm in part, reverse in part, and remand.

Plaintiff, Shayne Claymore (Claymore), an enrolled member of the Cheyenne River Sioux Tribe, and defendant, Janelle Johnson Serr (Serr), a non-Indian, attended high school together in Eagle Butte, South Dakota and began dating in their early teens. Serr became pregnant and gave birth to her daughter, Danette, in 1977. Claymore was the natural father of the child. Marriage was not contemplated at the time, and Serr and Danette resided with Serr's mother until 1980.

While Claymore, Serr, Danette, and other family members were in contact during this period, neither Claymore nor any member of his family contributed any meaningful financial support for Danette. Basically,

Serr and her family assumed entire responsibility for Danette's care and support during this period. Although Claymore was not employed for part of that time, he did get employment in 1979 and earned about $400 a month.

Serr graduated from high school in 1980 and attended school in Mitchell, South Dakota, until the Spring of 1981. During this period Claymore visited Serr and Danette perhaps twice a month in Mitchell. Claymore gave Serr a diamond ring in the latter part of 1980 but there was no formal engagement. Their relationship fluctuated. Although employed, Claymore did not provide any financial help to Serr for Danette's use except for an occasional ten or twenty dollars, and this depended on the state of the relationship between the parents.

Serr returned to Eagle Butte in the Spring of 1981 and remained there until the Fall. Claymore lived with Serr for a period of about six weeks. Serr held down two jobs, but although Claymore was still employed he did not help Serr with any expenses she had for herself or Danette except by occasionally buying groceries.

Serr left Eagle Butte for Spearfish, South Dakota in the Fall of 1981. Claymore made several visits there until the Spring of 1982 when Serr met her husband, Greg Serr. The Serrs were married in October of 1982 and moved to Dupree, South Dakota.

Claymore had almost no contact with Serr or Danette after the marriage. Claymore claims he was concerned about disturbing the Serr's in their new family life. Between 1982 and 1984, Claymore gave no financial support to Danette. However, during that two-year period Claymore was largely unemployed. Claymore did, however, send Christmas presents to Danette in 1983 as he had in the past. Claymore's parents also continued to send occasional gifts of clothing. Although Serr claims that she never denied Claymore or the paternal grandparents any right to visit Danette, it does appear that Serr did not encourage any visits and may have been slightly hostile to the suggestion that Danette be allowed to visit the Claymores.

Sometime in 1984, the Serrs commenced adoption proceedings for Mr. Serr's adoption of Danette. When Claymore learned of this he filed an action in circuit court for a declaratory judgment concerning his paternity, entry of an order requiring payment of child support, scheduled visitation rights, and a permanent restraining order against further adoption efforts by the Serrs. The Serrs entered an answer and counterclaim which set forth that Claymore had abandoned his minor child and that his parental rights should therefore be terminated by the court. The Serrs also requested that Mr. Serr be permitted to adopt Danette. Alternatively, the Serrs requested if the court should refuse to terminate Claymore's parental rights, then it should order child support payments in the amount of $200 per month and grant Serr reimbursement for certain maternity expenses.

The Cheyenne River Sioux Tribal Court was notified of the Serr petition by registered mail on July 5, 1985, pursuant to 25 U.S.C. § 1912(a). Rather than claim it retained exclusive jurisdiction under 25 U.S.C. § 1911(a) and request the circuit court to dismiss the action for lack of jurisdiction, the tribal court, on behalf of the Tribe, instead petitioned the circuit court to transfer jurisdiction to tribal court based on the general applicability of the Indian Child Welfare Act (I.C.W.A.), 25 U.S.C. § 1901 et seq. The Serr's objected to transfer under 25 U.S.C. § 1911(b), which allows the State court to apply a modified doctrine of *forum non conveniens*. Without addressing exclusive jurisdiction under the Act, the circuit court held there was no tribal jurisdiction under the Act, entered an order retaining jurisdiction, and set trial for October 29, 1985.

The Tribe made a motion to intervene on October 25, 1985. While an Indian child's tribe has a right to intervene at any point in any state court proceeding for the termination of parental rights to an Indian Child (25 U.S.C. § 1911(c)), since Danette was not an enrolled member of the Tribe, the Tribe requested a right to intervene pursuant to SDCL 15–6–24(a)(2). This time, both the motion to intervene and the complaint in

intervention claimed exclusive jurisdiction for the Tribe pursuant to 25 U.S.C. § 1911(a). The motion was denied. The court reiterated its position that the court would not recognize exclusive tribal jurisdiction under § 1911(a) or allow a forum non conveniens transfer under § 1911(b) because the tribal court was not entitled to jurisdiction in either case. The tribe did not appeal.

The plaintiff's parental rights were terminated by order of the trial court on January 27, 1986, and permission to adopt was approved upon proper application to the court. Plaintiff raises two issues on appeal: (1) whether the Indian Child Welfare Act, 25 U.S.C. § 1911 mandated dismissal of the circuit court action due to lack of jurisdiction; and, (2) whether the trial court erred in terminating the plaintiff's parental rights to his minor child.

Congress passed the I.C.W.A. in part because it found "that an alarmingly high percentage of Indian families are broken up by the removal, often unwarranted, of their children from them by nontribal public and private agencies...." 25 U.S.C. § 1901(4), and because "it is the policy of this Nation to protect the best interests of Indian children and to promote the stability and security of Indian tribes and families by the establishment of minimum Federal standards for the removal of Indian Children from their families ..." 25 U.S.C. § 1902. Therefore, "[A]n Indian tribe shall have jurisdiction exclusive as to any State over any child custody proceeding involving an Indian child who resides or is domiciled within the reservation of such tribe ..." 25 U.S.C. § 1911(a) (1983).

Under the Act, a "child custody proceeding" may be either a foster care placement, a preadoptive placement, an adoption, or a termination of parental rights. 25 U.S.C. § 1903(1). An "Indian child" is "any unmarried person who is under age eighteen and is either (a) a member of an Indian tribe or (b) is eligible for membership in an Indian tribe and is the biological child of a member of an Indian tribe." 25 U.S.C. § 1903(4).

In the present case we have both an Indian child and a child custody proceeding. However, in the trial court's opinion, the tribal court did not have jurisdiction in these proceedings under the Act because there was no existing "Indian family" losing an Indian child. The child had a non-Indian mother and never resided in an Indian family. Therefore, there was no exclusive tribal jurisdiction under § 1911(a) requiring dismissal from the circuit court. Moreover, the trial court was not required to transfer the case because one of the parents objected to the transfer under § 1911(b). The pivotal question in issue is therefore whether Danette was a member of an Indian family, and if not, whether this court should require that such a child be a member of an "Indian family" before the I.C.W.A. is held applicable.

The trial court relied on Justice Holmes' holding in the Kansas Supreme Court case of *Matter of Adoption of Baby Boy L.*, 231 Kan. 199, 643 P.2d 168 (1982). That case held that the Act is concerned with the removal of Indian children from an existing Indian family unit and the resultant breakup of the Indian family. 643 P.2d at 175. Therefore, the Act is not applicable in a case where an illegitimate child, who had never been a member of an Indian home or culture, is the subject of a child custody proceeding. 643 P.2d at 171. *See also, Miller v. Miller*, 703 S.W.2d 609 (Mo.App. 1986).

*Baby Boy L.* has been criticized in *In re Custody of S.B.R.*, 43 Wash.App. 622, 719 P.2d 154 (1986) as creating an exception to the I.C.W.A.. It is arguable whether the *Baby Boy L.* case created new requirements or merely found that the purposes of the Act were simply not meant to cover such a fact situation. The Act does not set forth the requirement of an existing Indian family, but it is implied throughout the Act. We note that both parties in this case indicated they believed the Act requires the child be a member of an Indian family.

The definition of an "Indian family" is not found anywhere in the Act. The circuit court implies that the definition should be restricted to the nuclear family or parents and offspring and should not include a broader or extended family. We believe that the references made in the Act to an

"Indian family" suggest the first definition of family. The narrower definition is also implicated by the Act's reference to all other relatives as "extended family members." See 25 U.S.C. § 1903(2).

Black's Law Dictionary, Fifth Edition, states that the definition of "family" necessarily depends on the field of law in which the word is used, the purpose intended to be accomplished by its use, and facts and circumstances in each case. *See LeRoux v. Edmundson,* 276 Minn. 120, 148 N.W.2d 812, 814 (1967). Most commonly it refers to a group of persons consisting of parents and children; immediate kindred, constituting the fundamental social unit in civilized society. *Black's, supra.* We believe this primary definition is controlling in this case.

■ The question for this court is whether application of the Act for jurisdictional purposes should depend on whether the Indian child, who is subject of a child custody proceeding, must be a member of an existing Indian family. We believe that the purpose of Act suggests that such a finding is a necessary condition for application of the Act. The case of *Baby Boy L., supra,* and the I.C.W.A. provisions cited therein are persuasive on this point. So too is the legislative history of the Act. *See generally,* H.Rep. No. 95–1386, 95th Cong., 2d Sess. *reprinted in* 1978 U.S. CODE CONG. & AD. NEWS 7530.

■ We hold that under the facts in this case, Danette was not removed from an existing Indian family. Danette has always resided with her non-Indian mother. Except for a period of six weeks, Claymore never lived with Danette or her mother. Claymore and Serr were never married. Claymore never supported Serr or Danette financially. No other member of Claymore's family provided any care and support for Danette except for occasional presents. Although we can understand the grandparents feelings for the child, Danette never resided with them. Danette's relationship with her extended family is minimal and is not pertinent under the definition of an Indian "family" under the I.C.W.A., nor has Danette had any involvement in tribal activities or participation in Indian Culture.

Danette may have been an "Indian child" by virtue of her biological father. However, under the facts of this case it is clear the child was not removed from an existing Indian family or its natural home. Nor was there any action by a social services agency to remove the child from an Indian home. Therefore, under the policy of the Act, there is no reason to find exclusive tribal jurisdiction in this matter. Nor do we believe that jurisdiction should have been transferred. Claymore himself initiated this action in circuit court and Serr objected to transfer under § 1911(b). Also, the Tribe did not appeal the trial court's decision on exclusive jurisdiction or a transfer of the case.

This court recognizes there may exist a recognizable Indian family relationship outside the traditional norm. A child might live with his unmarried parent or parents, where the custodial parent is Indian or where both parents are Indian. There may also be a family unit which is not a parent-child relationship. An Indian child, having both parents deceased, might for example have his care and custody assumed by the grandparents or other relatives. In such cases, there may be an established home environment and an existing social unit which could be found to be an Indian family. Such is not the case here. A non-Indian mother provided sole care and had custody of the child. The father never exercised parental responsibilities and never attempted to occupy the child's home. There was never an Indian family environment for the child.

The second issue in this case is whether or not there was clear and convincing evidence to terminate the plaintiff's parental rights pursuant to SDCL 25–6–4(2). The statute provides that "[N]o child may be adopted without the consent of his parents. However, the judge may waive consent from a parent who: ... (2) Has abandoned his or her child for a period of one year."

■ This Court has established the standard for determining abandonment.

To constitute abandonment under our code it must appear by clear and convincing evidence that there has been by the parents a giving-up or total desertion of the minor child. In other words, there

must be shown an absolute relinquishment of the custody and control of the minor and thus the laying aside by the parents of all care for it.

*Matter of Adoption of Sichmeller*, 378 N.W.2d 872 (S.D.1985); *Matter of Adoption of Bellows*, 366 N.W.2d 848 (S.D.1985); *Matter of Adoption of Ernst*, 318 N.W.2d 353 (S.D.1982); *In re Adoption of Christofferson*, 89 S.D. 287, 232 N.W.2d 832 (1975); *Mastrovich v. Mavric*, 66 S.D. 577, 287 N.W. 97 (1939). There must be a showing of an intent on the part of the parent to abandon and to relinquish parental obligations; this intention may be inferred from conduct. *Matter of Sichmeller, supra; Matter of Bellows, supra; In re Christofferson, supra.* In establishing abandonment, factors to be considered include a parent's presence, love, care and affection, and monetary support. *Matter of Sichmeller, supra, Matter of Christofferson, supra.*

Whether a parent has abandoned a child under SDCL 25–6–4 is a question of fact to be decided by the trial court. Unless the finding is clearly erroneous, it will not be overturned on appeal. *Matter of Sichmeller, supra; Matter of Bellows, supra; Matter of Adoption of Everett*, 286 N.W.2d 810 (S.D.1979); *In re Christofferson, supra.*

The trial court found that Claymore had abandoned his child. Danette, who will be ten later this year, although raised by her mother, knows and has had many contacts with her father and his parents. Considering the various contacts between the child and her paternal family, we cannot agree that she has been abandoned—although it is clear that the father has been totally neglectful and lacking in paternal responsibility, especially in the area of support. However, to determine abandonment under the limited evidence and to totally terminate parental rights and to authorize adoption creates too harsh a result.

We believe this finding was not supported by clear and convincing evidence. This court has defined "clear and convincing evidence" as follows:

> The measure of proof required by this designation falls somewhere between the rule in ordinarily civil cases and the requirement of our criminal procedure, that is, it must be more than a mere preponderance but not beyond a reasonable doubt. It is that measure or degree of proof which will produce in the mind of the trier of facts a firm belief or conviction as to the allegation sought to be established. Evidence need not be voluminous or undisputed to accomplish this.

*Brown v. Warner*, 78 S.D. 647, 653, 107 N.W.2d 1, 4 (1961).

We affirm the trial court on the issue of retaining jurisdiction, but reverse and remand on the abandonment issue with directions to establish support obligations and visitation rights and consider Serr's request for maternity expenses.

All the Justices concur.