**In the Matter of the ADOPTION OF T.N.F., a Minor.**

No. S–3104.

Supreme Court of Alaska.

Oct. 27, 1989.

Karla F. Huntington, Kentch and Huntington, Anchorage, for appellant.

Sarah J. Tugman, Tugman and Clark, Anchorage, for appellees.

Before MATTHEWS, C.J., and RABINOWITZ, COMPTON and MOORE, JJ.

## OPINION

MOORE, Justice.

The Indian Child Welfare Act, 25 U.S.C. §§ 1901–1963, (ICWA) provides minimum federal standards for the removal of Indian children from Indian families and allows vacation of any adoption decree rendered in violation of its terms. We first address the applicability of ICWA to the unique facts of this case. Secondly, we consider the applicability of Alaska's one-year statute of limitations to an action initiated pursuant to § 1914 of ICWA. The trial court found that the action to vacate the adoption decree was time-barred by Alaska's one-year statute of limitations. We affirm.

## I.

In 1986, SAF and BFF had been married for sixteen years. SAF could not have children. SAF's sister, LJJ, a California resident, who was married and had four children, agreed to have BFF's child for SAF. LJJ was artificially inseminated with BFF's sperm during a trip to Alaska, and then returned home to California. LJJ, the biological mother, and BFF, the biological father, have never lived together or established a family of any sort.

The child, TNF, was born in California on September 6, 1986 and is the biological daughter of BFF and his wife's sister, LJJ. Although SAF and LJJ are non-Indians, BFF is 1/32 Chickasaw Indian. Thus, the child, TNF, is 1/64 Chickasaw Indian as a result of her father's heritage. Shortly after TNF's birth, her custody was relinquished to SAF, who had arrived for the birth. SAF and BFF (hereinafter the F.s) remained in California for several weeks after the child's birth and then returned to Anchorage with her.

On November 2, 1986, LJJ signed a written consent (as did her husband) to the adoption of TNF by SAF. The consent states that LJJ "consents to the adoption of [TNF] by [SAF] and is aware that she has the right to withdraw this consent as provided in A.S. 25.23.070(b)," and that "she has read this document and fully understands that her consent to this adoption terminates her legal rights as the mother of [TNF] and freely and voluntarily consents to the adoption." LJJ made one change in the consent form.[1] She was also provided a copy of the Alaska statute concerning withdrawal of consent.[2] LJJ signed her consent and it was notarized in California, before a notary public for that state.

On December 12, 1986, SAF filed a petition for the adoption of TNF. Notices of the adoption proceedings were sent to LJJ and the Chickasaw Tribe. The notice noted that TNF was of Indian blood but stated that the "adoption would not terminate or modify in any fashion the parental rights of [BFF] (1/32nd Chickasaw) as father of [TNF] (1/64th Chickasaw) and would merely terminate the parental rights of LJJ (non-Indian)." The notice also stated that "[i]f the Indian Child Welfare Act applies to this matter ... the following rights may apply," and listed the pertinent rights.

In their adoption petition, the F.s contended that ICWA did not apply to this adoption since LJJ is a non-Indian and the child was to remain with her Indian father. An adoption decree was entered by the Alaska Superior Court, Judge Peter A. Michalski, in February of 1987. Judge Michalski specifically found ICWA inapplicable because the parental rights of the only Indian involved in the proceedings were not modified.

On April 18, 1988, LJJ filed a motion to vacate the adoption decree. She argued that ICWA was applicable and that her consent to the termination of her parental rights was invalid under § 1913(a) of ICWA since her consent was not "recorded before a judge."

On November 17, 1988, Judge Carlson denied the petition to vacate the decree of adoption. Judge Carlson rested his decision on AS 25.23.140 which provides that a decree of adoption may not be questioned on any ground one year after its issuance. The court found that ICWA applied but that it "enlarges the state's statute of limi-

---

1. She crossed out and initialed a sentence that read: "3. That [TNF] is not the member of any Indian tribe and is not the biological child of the member of any Indian tribe."

2. LJJ was provided a copy of AS 25.23.070 which provides:
   Withdrawal of Consent. (a) A consent to adoption may not be withdrawn after the entry of a decree of adoption.
   (b) A consent to adoption may be withdrawn before the entry of a decree of adop-

tion, within 10 days after the consent is given, by delivering written notice to the person obtaining consent, or after the 10-day period, if the court finds, after notice and opportunity to be heard is afforded to the petitioner, the person seeking the withdrawal, and the agency placing a child for adoption, that the withdrawal is in the best interest of the person to be adopted and the court orders the withdrawal.

tations only ... if the consent was obtained by fraud or duress." Since there were no allegations of fraud or duress, the court found that Alaska's one-year statute of limitations barred LJJ's petition to vacate the adoption. LJJ appeals.

## II.

Section 1913(a) of ICWA requires that any voluntary consent by a parent or Indian custodian to the termination of their parental rights be recorded before a judge.[3] LJJ argues that the decree of adoption is void because her consent to the adoption did not conform to this requirement, since it was only notarized by a California state notary and was not recorded before the Alaska judge.

In response, the F.s argue *inter alia* that 1) ICWA does not apply to this case since an "Indian family" is not involved, and 2) the one-year statute of limitations in AS 25.23.070 bars the § 1914 action.

### A. Standard of Review

The applicability of ICWA to this case and the question of whether § 1914 of ICWA incorporates state statutes of limitations are questions of law to which we apply our independent judgment. *Sloan v. Jefferson,* 758 P.2d 81, 83 (Alaska 1988). We will "adopt the rule of law that is most persuasive in light of precedent, reason and policy." *Guin v. Ha,* 591 P.2d 1281, 1284 n. 6 (Alaska 1979).

### B. Applicability of the Indian Child Welfare Act

■ Congress adopted the Indian Child Welfare Act of 1978, 25 U.S.C. §§ 1901–1963, in response to concerns over the con-sequences to Indian children, Indian families and Indian tribes of abusive state child welfare practices that resulted in the separation of large numbers of Indian children from their families and tribes.[4] In order to address these concerns, ICWA establishes "minimum Federal standards for the removal of Indian children from their families and the placement of such children in foster or adoptive homes which will reflect the unique values of Indian culture."[5]

Section 1913 of ICWA provides that any "voluntary termination of parental rights" by "any parent or Indian custodian" must be "executed in writing and recorded before a judge ... of competent jurisdiction." LJJ argues that § 1913 applies to TNF's adoption since she falls under ICWA's definition of a parent and TNF falls under the Act's definition of an Indian child. Section 1903(9) of ICWA states that " 'parent' means any biological parent or parents of an Indian child or any Indian person who has lawfully adopted an Indian child, including adoptions under tribal law or custom. It does not include the unwed father where paternity has not been acknowledged or established." We agree that as the biological parent of TNF, LJJ falls within the Act's protections in § 1913(a).

Secondly, LJJ argues that TNF falls within the Act's definition of an Indian child. The Act defines an Indian child as "any unmarried person who is under age eighteen and is either (a) a member of an Indian tribe or (b) is eligible for membership in an Indian tribe and is the biological child of a member of an Indian tribe." 25 U.S.C. § 1903(4) (Supp.1987). TNF's biological father, BFF, is a member of the

---

**3.** Section 1913(a) provides:

Where any parent or Indian custodian voluntarily consents to a foster care placement or to termination of parental rights, *such consent shall not be valid unless* executed in writing and *recorded before a judge of a court of competent jurisdiction and accompanied by the presiding judge's certificate that the terms and consequences of the consent were fully explained in detail and were fully understood by the parent or Indian custodian.* The court shall also certify that either the parent or Indian custodian fully understood the expla-nation in English or that it was interpreted into a language that the parent or Indian custodian understood. Any consent given prior to, or within ten days after, birth of the Indian child shall not be valid.

*25 U.S.C. § 1913(a) (Supp.1987) (emphasis added).*

**4.** *See* H.R.Rep. No. 1386, 95th Cong., 2d Sess. 8–12 (1978), *reprinted in* 1978 U.S.Code Cong. & Admin.News 7530, 7530–34.

**5.** 25 U.S.C. § 1902 (Supp.1987).

Chickasaw Nation. As the biological child of BFF, TNF is also a member of the Chickasaw tribe. As a result, TNF falls within the definition of an Indian child under ICWA.

■ The F.s argue that the result of applying ICWA to this case would be to disrupt an Indian family, not to protect one. They urge us to follow several state court decisions holding that ICWA does not apply to the adoption of an Indian child which was never part of an Indian family. The F.s also point to language in ICWA indicating that Congress intended the act to protect Indian families.[6] The F.s also rely on the Congressional findings of purpose within ICWA in arguing that the Act should not be applied in this case.

In enacting ICWA Congress found:

(4) that an alarmingly high percentage of Indian families are broken up by the removal, often unwarranted, of their children from them by nontribal public and private agencies and that an alarmingly high percentage of such children are placed in non-Indian foster and adoptive homes and institutions; and

(5) that the States, exercising their recognized jurisdiction over Indian child custody proceedings through administrative and judicial bodies, have often failed to recognize the essential tribal relations of Indian people and the cultural and social standards prevailing in Indian communities and families.

25 U.S.C. § 1901 (Supp.1987). In § 1902 Congress made the following declaration of policy:

The Congress hereby declares that it is the policy of this Nation to protect the best interests of Indian children and to promote the stability and security of Indian tribes and families by the establishment of minimum Federal standards for the removal of Indian children from their families and the placement of such children in foster or adoptive homes which will reflect the unique values of Indian culture.

25 U.S.C. § 1902 (Supp.1987).

Several of the cases the F.s rely on[7] involved belated challenges by unwed Indian fathers to the adoption of an illegitimate Indian child.[8] The Supreme Court of Indiana expanded on the holdings of these cases in *In the Matter of the Adoption of T.R.M.*, 525 N.E.2d 298, 302–03 (Ind.1988). In *Adoption of T.R.M.*, an Indian mother

---

**6.** The F.s also argue that LJJ is collaterally estopped from relitigating the issue of the Act's application to this case since the findings of law within the adoption decree specifically note that the Act does not apply. Collateral estoppel applies to issues actually litigated by the parties to the prior judgment. *Bignell v. Wise Mechanical Contractors*, 720 P.2d 490, 494–95 (Alaska 1986). "Notions of fairness require that only those issues that have been fully litigated and considered by the parties should be excluded from future actions." J. Friedenthal, M. Kane, A. Miller, *Civil Procedure* 675 (1985). While LJJ was a party to the adoption action, she did not participate adversarially in the proceedings. She was not represented by counsel and the only briefing on the Act's applicability was done by the F.s' attorneys. We therefore conclude that the issue was not so fully litigated as to bar LJJ from raising it in this action to set aside the decree.

**7.** *See In the Matter of the Adoption of T.R.M.*, 525 N.E.2d 298, 302–03 (Ind.1988); *In the Matter of the Adoption of Baby Boy L.*, 231 Kan. 199, 643 P.2d 168, 175 (1982); *In the Matter of the Adoption of Baby Boy D.*, 742 P.2d 1059, 1064 (Okl.1985) *reh'g denied* (1987), *cert. denied*, —

U.S. ——, 108 S.Ct. 1042, 98 L.Ed.2d 1005 (1988); *In the Interest of S.A.M.*, 703 S.W.2d 603, 607–09 (Mo.App.1986); *Claymore v. Serr*, 405 N.W.2d 650, 654 (S.D.1987); *see also* Note, *The Indian Child Welfare Act: Does It Cover Custody Disputes Among Extended Family Members?*, 1 Alaska L.Rev. 157, 160–68 (1984) (critique of this court's refusal to create an "Indian family" exception to ICWA in *A.B.M. v. M.H.*, 651 P.2d 1170 (Alaska 1982)).

**8.** *See, e.g., Baby Boy L*, 643 P.2d at 175 (ICWA does not "dictate that an illegitimate infant who has never been a member of an Indian home or culture ... should be removed from its primary cultural environment over the express objections of its non-Indian mother"); *Baby Boy D*, 742 P.2d 1059 (unwed father lacked standing to invoke ICWA since he never had custody and had not acknowledged or established paternity and where child never resided in an Indian family and had a non-Indian mother); *S.A.M.*, 703 S.W.2d at 607–09 (Mo.App.1986) (ICWA did not apply since unwed Indian father and non-Indian mother never lived as a family); *Claymore*, 405 N.W.2d at 654 (ICWA inapplicable since Indian child resided with non-Indian mother and was never part of "Indian family").

arranged to have her illegitimate child adopted by a non-Indian couple. One year later, the Indian mother and the Tribe brought actions to invalidate the adoption on the grounds that it did not comply with ICWA. The court found ICWA did not apply since the child was given up shortly after birth and thus was never part of an Indian family. The court noted that "except for the first five days after birth, [T.R.M.'s] entire life of seven years to date has been spent with her non-Indian adoptive parents in a non-Indian culture." *Id.* at 303.

*Adoption of T.R.M.* and the other cases recognizing an "Indian family" exception to the plain language of ICWA have been criticized by a number of courts.[9] In *A.B.M. v. M.H.*, 651 P.2d 1170, 1173 (Alaska 1982), *cert. denied*, 461 U.S. 914, 103 S.Ct. 1893, 77 L.Ed.2d 283 (1982), we were urged to adopt an "Indian family" exception to the Act's coverage. There, an Indian child was adopted by the mother's sister and brother-in-law but the biological mother later sought to revoke her consent to the adoption.

> The prospective adoptive parents argue that because the Act was intended to remedy the agency bias that has resulted in the removal of Indian children from their cultural settings, its application is not required in the instant case. They contend that R.H.'s adoption by members of her "extended family" (M.H. and A.H.) will not deprive her of the exposure to Indian cultural or social values the Act is designed to safeguard.
>
> We agree that the H.'s have correctly identified one of the primary purposes of the Act, and that application in the instant case is not required to preserve R.H.'s ties to Indian culture or social values. Nevertheless, we cannot justify

creating a judicial exception to the Act's coverage on this basis alone.

651 P.2d at 1173.

Similarly, we decline to create an exception to the Act's coverage in this case. We initially note that in enacting ICWA, Congress did not seek simply to protect the interests of individual Indian parents. Rather, Congress sought to also protect the interests of Indian tribes and communities, and the interests of the Indian children themselves. *See Mississippi Band of Choctaw Indians v. Holyfield*, —— U.S. ——, ——, 109 S.Ct. 1597, 1609, 104 L.Ed.2d 29 (1989). Reliance on a requirement that the Indian child be part of an Indian family for the Act to apply would undercut the interests of Indian tribes and Indian children themselves that Congress sought to protect through the notice, jurisdiction and other procedural protections set out in ICWA.

We have serious policy reservations concerning the creation of judicial exceptions to the plain language of ICWA as was done by the Indian Court in *Adoption of T.R.M.* The court in *Adoption of T.R.M.* sidestepped the Act's protections by relying on the fact that the mother gave up the child shortly after its birth. Such application of an "Indian family" requirement effectively deprived both the Indian mother and her Tribe of the protections set out in the Act. It would seem that the adoption in *T.R.M.* was exactly the type of scenario in which Congress sought to impose federal procedural safeguards in order to protect the rights of the Indian parents and their tribe.

Moreover, these judicially-created exceptions to the coverage of ICWA are somewhat suspect in light of the Act's purpose of imposing federal procedural safeguards. State courts must be particularly hesitant in creating judicial exceptions to a federal act which was enacted to counter state

---

**9.** *See, e.g., In re Junious M.,* 144 Cal.App.3d 786, 193 Cal.Rptr. 40, 46 (1983) ("We note that the trial court predicated its decision not to apply the Act in part, on its determination that the minor had developed no identification as an Indian. The language of the Act contains no such exception to its applicability, and we do not deem it appropriate to create one judicial-

ly."); *In Re Custody of S.B.R.,* 43 Wash.App. 622, 719 P.2d 154, 156 (1986) ("The Browns assert that the Act does not apply where the child has never been part of an Indian family relationship. Again, the language of the Act contains no such exception, and the Browns have presented no compelling reasons to create one.").

courts' prejudicial treatment of Indian children and communities.[10]

We certainly agree with the F.s' contention that it is very unlikely that Congress had surrogate parent arrangements in mind when it adopted the Act. However, to utilize a judicially-created "Indian family" exception would be to enter onto a slippery slope which threatens to exclude the very type of cases Congress had in mind when it adopted the Act.

Under the plain language of the statute, LJJ has standing to challenge the adoption under ICWA because she is the biological parent of an Indian child under § 1903(9).

C. Application of State Statutes of Limitations to Section 1914 of ICWA

■ Section 1914 provides that "any parent or Indian custodian from whose custody [an Indian] child has been removed ... may petition any court of competent jurisdiction to invalidate such action upon a showing that such action violated any provision of the sections 1911, 1912, and 1913 of this title." Section 1914 does not set forth any time limitations for such a collateral attack. The only time limitations mentioned in the Act are in § 1913(d). Section 1913(d) provides that once an adoption decree is final, the parent may withdraw an otherwise valid consent to an adoption on the grounds that the consent was obtained through fraud or duress if the petition to vacate the decree is made within two years unless a longer period is allowed under state law.[11]

Judge Carlson found that since ICWA was silent as to statutes of limitations, except in the narrow situation specified in 1913(d), actions under § 1914 are governed by AS 25.23.140(b).[12] LJJ argues that incorporation of the one-year statute of limitation would frustrate the legislative intent of ensuring that voluntary consents to the termination of parental rights meet minimum federal procedural safeguards. In particular, LJJ argues that a short state-imposed statute of limitations would essentially prevent the challenge of many adoptions made in violation of ICWA.

The United States Supreme Court has consistently held that "[w]hen Congress has not established a time limitation for a federal cause of action, the settled practice [is] to adopt a local time limitation as federal law if it is not inconsistent with federal law or policy to do so." *Wilson v. Garcia,* 471 U.S. 261, 266–67, 105 S.Ct. 1938, 1941–42, 85 L.Ed.2d 254, 260 (1985).[13] The resolution of whether § 1914 incorporates state statutes of limitations thus centers on whether the one-year Alaska statute ob-

10. *See, e.g., Mississippi Band of Choctaw Indians v. Holyfield,* —— U.S. ——, ——, 109 S.Ct. 1597, 1606, 104 L.Ed.2d 29 (1989); *In re Adoption of Halloway,* 732 P.2d 962, 969 (Utah 1986); 25 U.S.C. § 1901(5) ("Congress finds the States, exercising their recognized jurisdiction over Indian child custody proceedings through administrative and *judicial bodies,* have often failed to recognize the essential tribal relations of Indian people and the cultural and social standards prevailing in Indian communities and families") (emphasis supplied); H.R.Rep. No. 95–1389, 95th Cong., 2d Sess. 21, *reprinted in* 1978 U.S. Code Cong. & Admin.News 7530, 7543, 7544.

11. Section 1913(d) provides:
After the entry of a final decree of adoption of an Indian child in any State court, the parent may withdraw consent thereto upon the grounds that consent was obtained through fraud or duress and may petition the court to vacate such decree. Upon a finding that such consent was obtained through fraud or duress, the court shall vacate such decree and return the child to the parent. No adoption which has been effective for at least two years may be invalidated under the provisions of this subsection unless otherwise permitted by state law.
25 U.S.C. § 1913(d) (Supp.1987).

12. AS 25.23.140(b) provides in part:
Subject to the disposition of an appeal, upon the expiration of one year after an adoption decree is issued, the decree may not be questioned by any person including the petitioner, in any manner upon any ground, including fraud, misrepresentation, failure to give any required notice, or lack of jurisdiction of the parties or of the subject matter....

13. *See also Reed v. United Trans. Union,* 488 U.S. ——, 109 S.Ct. 621, 626, 102 L.Ed.2d 665, 674 (1989); *South Carolina v. Catawba Indian Tribe, Inc.,* 476 U.S. 498, 505, 106 S.Ct. 2039, 2043, 90 L.Ed.2d 490, 498 (1986); *Board of Regents v. Tomanio,* 446 U.S. 478, 483–84, 100 S.Ct. 1790, 1794–95, 64 L.Ed.2d 440, 447 (1980); *Johnson v. Railway Express Agency, Inc.,* 421 U.S. 454, 462, 95 S.Ct. 1716, 1721, 44 L.Ed.2d 295, 302 (1975).

structs or frustrates the purposes of ICWA.

Similarly, under a federal preemption analysis of whether § 1914 prevents application of state law, we apply the following analysis:

first, looking to the "policy, intent, and context" of the federal statute, whether the state regulation is expressly or implicitly preempted, second, even if no declaration is found, whether the statutes conflict to the extent that (1) it is impossible to comply simultaneously with the dual regulation or (2) the state regulation obstructs the execution of the purpose of the federal regulation.

*Webster v. Bechtel,* 621 P.2d 890, 897 (Alaska 1980).

As to the first prong, Congress clearly did not preempt the entire field of family law relating to Indian children. Rather, Congress sought to impose certain minimum federal standards to ensure that Indian families and Indian culture were respected in child welfare decisions.

Thus, under both a preemption analysis and the *Wilson* test, the resolution of this issue centers on whether § 1914 conflicts with the state statute of limitations so as to obstruct or frustrate the purposes of ICWA.

It is clear that Congress intended state statutes of limitations to govern the withdrawal of valid consents under the Act. Section 1913(d) provides for one exception to the application of state statutes of limitation by allowing collateral attacks on consents obtained through fraud or duress for at least two years after the final decree of adoption. The legislative history makes clear that "[t]his right is limited to two years after entry of the the decree unless a longer period is provided by state law." H.R. No. 95–1386, 95th Cong., 2d Sess. 23 (1978), *reprinted in* 1978 U.S.Code Cong. & Admin.News 7530, 7545–46. It is therefore clear that Congress realized that state statutes of limitations might bar withdrawal of valid consents earlier than two years

after the decree and wished to establish an exception to those limitations in cases of fraud or duress.

The critical issue is whether Congress intended state statutes of limitations to apply to § 1914 actions to set aside consents which are *invalid* under the terms of the Act. LJJ cites to one commentary on the Act which argues that invalid consents under § 1913 are void as a matter of law and not subject to state statutes of limitations. These commentators argue:

No specific federal statute of limitations is provided for suits brought pursuant to section 1914. It is thus possible that in many instances a parent's collateral attack upon the state decree would be barred by a state statute of limitations. However, with respect to decrees entered in violation of two particular provisions of ICWA, there may be no time limit on the bringing of a suit. In those child custody proceedings in which the tribal court had exclusive jurisdiction pursuant to subsection 1911(a), any state court orders or decrees would be void *ab initio.* Similarly, since parental consent obtained in violation of the ICWA is invalid as a matter of law, any subsequent state court order for foster care or adoptive placement predicated on that defective consent should likewise be void. It would seem, therefore, that if these particular violations of the Act render the state court orders or decrees void, such void orders and decrees could be vacated by another court at any time.

Trentadue and DeMontigny, *The Indian Child Welfare Act of 1978: A Practitioner's Perspective,* 62 N.D.L.Rev. 487, 536 (1986) (footnotes omitted).

We disagree with these commentators' analysis. We initially note they do not cite any case law, nor have we found any authority,[14] for their proposition that consents in violation of ICWA can be set aside at any time. More importantly, however, it would be inconsistent to allow a collateral attack on a consent in violation of ICWA to

---

14. *A.B.M. v. M.H.,* 651 P.2d 1170 (Alaska 1982), does not support LJJ's position that § 1914 actions can be brought at any time. The State's motion to vacate the decree of adoption in that case was made within the one year period provided for in AS 25.23.140. 651 P.2d at 1171–72.

be brought at any time but only allow collateral attacks on consents which are the product of fraud or duress within two years of the adoption decree. Fraud and duress are evils at least as serious as violations of the procedural protections contained in ICWA. A consent obtained in violation of § 1913 of ICWA should not be more questionable than a consent obtained through fraud or duress. Since Congress clearly intended that state statutes of limitations would apply to actions pursuant to § 1913(d) it is logical to assume that state statutes of limitations also apply to § 1914 actions. If Congress had intended to establish a minimum time for bringing § 1914 actions, it would have mandated a statutory minimum as it did in § 1913(d).

This conclusion is buttressed by the fact that a number of other important federal statutes have been construed to incorporate state statutes of limitations. For example, the United States Supreme Court has held that state statutes of limitations apply to civil rights actions under 42 U.S.C. § 1983. *Wilson*, 471 U.S. at 268, 105 S.Ct. at 1942; *Board of Regents v. Tomanio*, 446 U.S. 478, 483–84, 100 S.Ct. 1790, 1794–95, 64 L.Ed.2d 440 (1980). State statutes of limitations have been applied to a number of other important federal causes of action. *See, e.g., Ernst & Ernst v. Hochfelder*, 425 U.S. 185, 210 n. 29, 96 S.Ct. 1375, 1389 n. 29, 47 L.Ed.2d 668 (1976) (section 10(b) actions under the Securities Exchange Act of 1934); *Hawaii Carpenters' Trust v. Waiola Carpenter Shop*, 627 F.Supp. 237, 243–44 (D.Hawaii 1985) (Employee Retirement Income Security Act actions).

As a matter of policy, both the two-year federal statute of limitations in § 1913(d) and the one-year limitation in AS 25.23.140 recognize that at some point adoptions must become final. To allow collateral attacks on final adoption decrees at any time threatens to unreasonably disrupt the upbringing of the adopted child. AS 25.23.-140 is a strong policy statement by the Alaska Legislature that an adoption decree

should not be challenged on any ground after one year.

Section 1914 seeks to enforce important federal procedural rights contained in ICWA. However, this interest must be balanced against the adoptive family's interests. At some point, the adopted child's relations with his or her adoptive parents needs protection from further disruption.

LJJ argues that the United States Supreme Court's recent decision in *Mississippi Band of Choctaw Indians v. Holyfield*, — U.S. ——, 109 S.Ct. 1597, 104 L.Ed.2d 29 (1989), precludes application of state statutes of limitations since such a result would disrupt uniform nationwide application of ICWA. The Supreme Court's decision in *Holyfield* centered on the question of whether state law governed the definition of "domicile" in § 1911(a) of ICWA. This section establishes exclusive jurisdiction in the tribal courts for proceedings concerning an Indian child "who resides or is domiciled within the reservation of such tribe." 25 U.S.C. § 1911(a) (Supp.1987). The Court first noted that the proper construction of the term domicile as used in ICWA was a matter of federal law, reasoning that Congress did not intend such a critical jurisdictional term to be defined by reference to varying state laws. The Court concluded that Mississippi law defining domicile was inconsistent with "generally accepted doctrine in this country and cannot be what Congress had in mind when it used the term in the ICWA." — U.S. at ——, 109 S.Ct. at 1608. The Court therefore vacated the state court adoption decree, holding that the Choctaw tribal court had exclusive jurisdiction over the adoption pursuant to ICWA. — U.S. at ——, 109 S.Ct. at 1610–11.

In their dissent, Chief Justice Rehnquist and Justices Stevens and Kennedy expressed concern that the Court's interpretation of domicile "renders any custody decision made by a state court suspect, susceptible to challenge at any time as void for having been entered in the absence of jurisdiction."[15] — U.S. ——, 109 S.Ct. at

---

**15.** In footnote 12, — U.S. ——, 109 S.Ct. at 1616, the dissenters noted a decision by the

Utah Supreme Court, *In re Adoption of Holloway*, 732 P.2d 962 (Utah 1986), in which some

1616. LJJ argues that the Court's reasoning dictates that a consent to adoption made in violation of § 1913(a) is likewise subject to challenge at any time. We disagree.

We initially note that the § 1914 action in *Holyfield* was brought by the Tribe within two months of the state court's adoption decree. —— U.S. at ——, 109 S.Ct. at 1603. As a result, the majority in *Holyfield* did not reach the issue of the time limits for such a motion since the § 1914 action was brought in a timely manner.[16]

More importantly, however, unlike the state chancery court in *Holyfield*, the superior court in the case at bar had jurisdiction over the adoption when it issued its decree.[17] We do not equate a decree made without jurisdiction with a decree based on a consent allegedly made in violation of a non-jurisdictional provision of ICWA.[18] It is well-settled law that decrees issued by a court without jurisdiction are void and generally may be set aside if relief is sought within a reasonable time. Restatement (Second) of Judgments §§ 65, 69 (1982); C. Wright & A. Miller, *Federal Practice and Procedure: Civil* § 2862, at 198–200 (1973). The same is not true of erroneous judgments. *Title v. United States*, 263 F.2d 28, 31 (9th Cir.), *cert. denied*, 359 U.S. 989, 79 S.Ct. 1118, 3 L.Ed.2d 978 (1959); *Bowers v. Board of Appeals*, 16 Mass.App.

29, 448 N.E.2d 1293, 1295, *review denied*, 389 Mass. 1104, 451 N.E.2d 1167 (1983); Wright & Miller, *supra* § 2862, at 198–200.

■ We therefore conclude that ICWA incorporates state statutes of limitations except in challenges based on fraud or duress which are governed by the two-year statute of limitations in § 1913(d). Since LJJ does not raise any allegation of fraud or duress,[19] we conclude that application of a state statute of limitations is appropriate to determine whether LJJ's challenge to the adoption decree is time barred.

D. Does the Alaska or California Statute of Limitations Apply to this Action?

■ LJJ argues that if state statutes of limitations apply to § 1914 actions, the superior court erred in applying Alaska's one-year limitation rather than California's three-year limitation. Since LJJ did not raise this issue in the trial court, she poses her argument in terms of a constitutional due process violation.

A state violates federal due process if it applies its own substantive law to a transaction with little or no relationship to the forum state. *Phillips Petroleum Co. v. Shutts*, 472 U.S. 797, 105 S.Ct. 2965, 86 L.Ed.2d 628 (1985). A state "must have a 'significant contact or aggregation of con-

two years after the petition for adoption was filed, the Indian tribe intervened in the proceeding and after appeal to the Utah Supreme Court succeeded in having the case transferred to the Tribal court.

Even assuming that *Halloway* did not involve a question of exclusive tribal jurisdiction under ICWA, the case does not provide support for LJJ's position that § 1914 actions may be brought at any time since a final decree of adoption was never issued in the case. The Navajo tribe therefore did not have to bring a § 1914 action to set aside the decree. Rather, the Tribe sought to intervene in the proceedings two years after the trial court ordered the adoptive parents to contact the Tribe and obtain its consent before proceeding. *Id.* at 963. The Tribe intervened after negotiating informally for the child's return. *Id.* at 963 n. 1. The trial court denied the Tribe's motion to transfer the case to the Tribal court pursuant to § 1911(b). *Id.* at 963–64. The Utah Supreme Court reversed, holding that the Navajo Nation had exclusive jurisdiction over the child. *Id.* at 972.

16. Mississippi law requires that an action to set aside a final decree of adoption be brought within six months. Miss.Code Ann. § 93–17–15 (1987).

17. The exclusive tribal jurisdiction provisions in § 1911(a) are not at issue in this case. It is not alleged that T.N.F. has ever resided or is domiciled within the Chickasaw Reservation.

18. *See* Annotation, *Validity and Construction of Statutes Imposing Time Limitations Upon Actions to Vacate or Set Aside an Adoption Decree or Judgment*, 83 A.L.R.2d 945, 949–50 (1962) ("In the absence of fraud, the courts have declined to accept lack of the requisite consent to the adoption by one of the parties necessary, or other procedural irregularities, as grounds for excluding the application of time limitation provisions for attacks on the adoptions").

19. At oral argument, counsel for LJJ specifically conceded that fraud or duress in obtaining the consent was not an issue in this case.

tacts' to the claims ..., contacts 'creating state interests,' in order to ensure that the choice of [state] law is not arbitrary or unfair." *Shutts,* 472 U.S. at 821, 105 S.Ct. at 2979, 86 L.Ed.2d at 648.

Alaska has sufficient contacts with and interests in this adoption to ensure that application of Alaska law was not arbitrary or unfair to LJJ. The original decree was issued by an Alaska court, the adoptive child and her family live in Alaska, TNF was conceived in Alaska, LJJ consented to the adoption in an Alaska court, the consent stated that Alaska law governing withdrawal of consent prior to entry of a decree applied to this adoption, and LJJ invoked the jurisdiction of the Alaska court to set aside the decree.[20] We therefore conclude that the application of Alaska law conformed to the dictates of due process.

### III.

In conclusion, we find that Judge Carlson correctly applied the one-year statute of limitations contained in AS 25.23.140(b) so as to bar LJJ's § 1914 action to vacate the adoption decree. The judgment of the superior court is AFFIRMED.

COMPTON, J., concurs.

RABINOWITZ, J., dissenting in part.

BURKE, J., not participating.

COMPTON, Justice, concurring.

I agree with the result the court reaches, but do not agree with its reasoning. In my view, the Indian Child Welfare Act (Act), 25 U.S.C. §§ 1901–1963 (1983) does not apply to LJJ's action to set aside the decree of adoption. Since LJJ cannot avail herself of the Act's protections, we have to look no farther than AS 25.23.140(b) to resolve the case.

Through United States Const. art. I, § 8, cl. 3 and other constitutional authority, the United States reserved to Congress the power to regulate commerce with Indian tribes, and plenary power over Indian affairs. The Indian Child Welfare Act is grounded in this special relationship between the United States and Indian tribes and their members, and Federal responsibility to Indian people. The import of the Act's congressional findings, 25 U.S.C. § 1901, and declaration of congressional policy, 25 U.S.C. § 1902, is a concern for Indian culture, Indian tribes, Indian tribal members, Indian families, and Indian children. The purpose of the Act is to protect the universe of Indian people by protecting discrete segments of that universe. The principal malefactor is the non-Indian and non-Indian agency, public or private.

I join with the court in rejecting the so-called "Indian family" exception to the plain language of the Indian Child Welfare Act. Such an exception could lead too easily to chicanery which would defeat the very purpose of the Act. I do not agree with the court, however, that the non-Indian in this case, LJJ, may avail herself of the protections of the Act to further purposes which have nothing to do with furtherance of Indian welfare, so emphatically determined by Congress to be in need of protection.

According to affidavits filed on behalf of SAF and BFF, there came a point after the birth of TNF when her biological mother, LJJ, began to regret her surrogate parent role and resent other family members, including her parents and her sisters, one of whom, SAF, had become the adoptive mother of the child. Following an apparent suicide attempt, LJJ began collecting material regarding surrogate parenthood. She sent packets of anti-surrogacy material to her mother and another sister, including

**20.** *See In re Appeal in Pima County Juvenile Action No. B–7087,* 118 Ariz. 437, 577 P.2d 723, 724 (1977) ("Adoption being a status, its creation and existence is governed by the law of the forum creating such status. 1 Conflict of Law, Restatement 2nd, § 78"), *affirmed,* 118 Ariz. 428, 577 P.2d 714 (1978); *In re Adoption of J.L.H. & J.P.H.,* 737 P.2d 915, 918–20 (Okl.1987); *Watkins v. Chirrick,* 19 Or.App. 241, 526 P.2d 1399, 1401–02 (1974); *In re Adoption of MM,* 652 P.2d 974, 980 (Wyo.1982) (Wyoming law not New York law applied since adoptive child resided in Wyoming and action brought in Wyoming. Wyoming therefore had the "greatest interest in the child's welfare and should properly apply its own law"); Restatement (Second) of Conflict of Laws § 78 (1971).

press clippings regarding her own case and the efforts being made by the National Coalition Against Surrogacy to assist her. Apparently she testified in support of an anti-surrogacy bill before a legislative body, and appeared on television programs in both Seattle and Los Angeles, during which she espoused her anti-surrogacy views. LJJ's mother opines that LJJ may be attempting to obtain remuneration by creating publicity regarding her case.

It is within this context that LJJ seeks to avail herself of the protections of the Act. Regardless of the merits of her anti-surrogacy views, or other personal reasons she may have for wanting to set aside the decree of adoption, nothing LJJ has advanced furthers the cause of Indian welfare. Although she has provided an affidavit in which she states that it is not her present intention to obtain custody of TNF, she is seeking significant visitation rights to further both her desire to have the best maternal relationship with TNF that circumstances permit and her desire that TNF and her other other children get to know one another. While these goals may be born of the best intentions, I submit that the Act is not the appropriate vehicle to achieve them. As the trial judge correctly noted, LJJ's legal position would defeat the very purpose the Act was enacted to serve.

The Supreme Court of New Jersey had occasion to discuss the Act at length in *Matter of Adoption of a Child of Indian Heritage*, 111 N.J. 155, 543 A.2d 925 (N.J. 1988). In that case, the unwed Indian mother took her baby from her home in a town bordering the Rosebud Sioux Indian Reservation to New Jersey for adoptive placement. She and the putative father already had one child, and allegedly she told the putative father that he was the father of this baby. At about the time of birth of the baby, the putative father returned to his family home in a nearby town, where he remained until approximately a month after birth. When he returned and began again to live with the mother, he learned that the baby had been placed for adoption. He did nothing for approximately 21 months, at which time he filed suit to set aside the adoption. The suit was filed one day before the expiration of the relevant statute of limitations. He never sought to establish paternity by either a court proceeding, written acknowledgement of paternity or holding out the baby as his own. It was on this basis that the New Jersey Supreme Court rejected the putative father's argument, since 25 U.S.C. § 1903(9) excludes an unwed father from the definition of "parent" under the Indian Child Welfare Act where paternity has not been acknowledged or established. Since only a parent or Indian custodian can invalidate an action for termination of parental rights, 25 U.S.C. § 1914, the putative father in this case could not prevail.

The case is of interest in several respects. First, it rejected the "Indian family" exception, just as does this court today. I find its reasoning persuasive. Additionally, it rejected a related argument that since the child was never in the putative father's custody, the child was not "removed" from the putative father's custody and thus the putative father had no standing under 25 U.S.C. § 1914 to challenge the adoption. Again, I find the court's reasoning persuasive. However, it is clear throughout the opinion that the court assumes that the "parent" referred to in the Act is an Indian parent, not a non-Indian parent. Furthermore, as the court develops extensively, the entire thrust of the Indian Child Welfare Act is the protection of Indian people. The clear implication is that the Indian Child Welfare Act should not be applied where its application is inconsistent with that purpose.

In concluding its decision, the court observes:

> The Act provides *Indian parents* the right to challenge even a final judgment of adoption in situations where a non-Indian would have no right to complain; it is only [the putative father's] unexcused delay in establishing his right as a parent that prevents him from taking advantage of the benefits provided by the Act.

*Child of Indian Heritage*, 543 A.2d at 943. (Emphasis added).

Whether LJJ is sincere in her declaration that she does not intend to gain custody of TNF is not significant. What is significant is the principle she seeks to establish; a non-Indian may avail himself or herself of the protections of the Act, even when the result would be to stand the Act on its head.[1] LJJ was not without rights and remedies, for she had both under state law. In my view what she does not have are rights and remedies created especially for Indian people, when the principal she is seeking to establish inevitably would lead to results which would defeat the purposes of the Act.

I recognize that my construction of "parent" to include only a biological Indian parent may be open to the same criticism that has been leveled against the "Indian family" exception or the related "custody" exception derived from 25 U.S.C. § 1914. However, it is clear that "parent" does not necessarily include all biological parents, and further that it does not include a non-Indian person who has adopted an Indian child. Taken in context, I do not believe that a construction of the term "parent" that excludes non-Indian biological parents is an unreasonable one.

RABINOWITZ, Justice, dissenting in part.

I agree with the court's holding that the Indian Child Welfare Act applies to L.J.J.'s petition to vacate the adoption decree here in question, and further agree with the court's rejection of the "Indian family" exception to the Act's coverage. L.J.J. has standing to challenge the adoption because she is the biological parent of T.N.F., an Indian child. I cannot agree with the court's holding that the one year statute of limitations provided in AS 25.23.140(b) bars L.J.J.'s § 1914 action to vacate the adoption decree.

As the majority notes, "The critical issue is whether Congress intended state statutes of limitations to apply to § 1914 actions to set aside consents which are *invalid* under the terms of the Act." Maj.Op. at 979 (emphasis in original). In my view Congress' intent is clear. State statutes of limitations are inapplicable in circumstances where a § 1914 action is based on non-compliance with the provisions of § 1913(a).

Section 1913(a) provides:

Where any parent or Indian custodian voluntarily consents to a foster care placement or to termination of parental rights, *such consent shall not be valid unless* executed in writing and *recorded before a judge of a court of competent jurisdiction and accompanied by the presiding judge's certificate that the terms and consequences of the consent were fully explained in detail and were fully understood by the parent or Indian custodian.* The court shall also certify that either the parent or Indian custodian fully understood the explanation in English or that it was interpreted into a language that the parent or Indian custodian understood. Any consent given prior to, or within ten days after, birth of the Indian child shall not be valid.

25 U.S.C. § 1913(a) (Supp.1987) (emphasis added).

Given the unambiguous text of § 1913(a), I conclude Congress intended that any consent obtained in violation of the strict procedural safeguards governing termination of parental rights was to have no force or effect. It follows that an adoption based on an invalid consent is void *ab initio*, and that a petition to vacate such a void decree can, pursuant to § 1914, be filed at any time.

---

1. The court acknowledges how unlikely it is that Congress had a situation such as TNF's in mind when the Act was adopted (Op. at 14) and yet it proceeds to apply the Act. Although the "plain meaning" of the Act speaks to the court's result, it is a general rule of construction that "a thing which is within the letter of the statute is not within the statute unless it be within the intention of the makers." *Hawaii v. Mankichi,* 190 U.S. 197, 212, 23 S.Ct. 787, 788, 47 L.Ed. 1016 (1902). *See also, People v. Hannon,* 5 Cal.3d 330, 96 Cal.Rptr. 35, 486 P.2d 1235, 1238 (1971) (literal interpretation of a statute is not necessarily controlling and will be rejected if it leads to an absurdity); *Allen v. Multnomah County,* 179 Or. 548, 173 P.2d 475, 478 (1946) (in arriving at the legislative intention, it is proper for the court to take into consideration the policy and purposes of the act, and to consider, in that connection, whether or not such policy and purposes will be attached by a literal interpretation of the language used).

Admittedly, the factual circumstances of this case are highly unusual and there are significant considerations which militate against disturbing any parent-adoptive child relationship. Nevertheless, I believe that my reading of §§ 1913(a) and 1914 is consonant with Congress' overall intent in enacting the Indian Child Welfare Act and with the specific intent reflected in the procedural safeguards provided in § 1913(a).

It is apparent that the provisions of § 1913(a) were designed to increase the likelihood that a consent to termination of parental rights was in fact voluntarily given. If, but only if, ICWA's procedures are followed does the Act achieve its purpose to establish "minimum Federal standards for the removal of Indian children from their families." 25 U.S.C. § 1902 (Supp. 1987). If, but only if, such procedures have been followed should a parent of an Indian child need allege fraud, duress, or other misconduct.

I cannot agree that the absence of fraud or duress under § 1913(d) impliedly limits the protections of § 1913(a). § 1913(d) delimits minimum not maximum protection; it expands not contracts the rights of Indian parents. The majority instead construes the narrow provision of § 1913(d) to restrict the broad scope of ICWA and hobble its purpose.[1]

I would hold that L.J.J.'s petition to vacate the adoption decree is not barred by the one year statute of limitations of AS 25.23.140(b).[2]

---

1. The legislative history of ICWA discloses that Congress was aware of the following considerations:

> The decision to take Indian children from their natural homes is, in most cases, carried out without due process of law....
> Many cases do not go through an adjudicatory process at all, since the voluntary waiver of parental rights is a device widely employed by social workers to gain custody of children. Because of the availability of waivers and

because a great number of Indian parents depend on welfare payments for survival, they are exposed to the sometimes coercive arguments of welfare departments.

See H.R.Rep. No. 1386, 95th Cong., 2d Sess. 11 (1978), reprinted in 1978 U.S.Code Cong. & Admin.News 7530, 7533.

2. In reaching this conclusion I reject appellee's harmless error and substantial compliance arguments as lacking in merit.