[No. B036785. Second Dist., Div. One. Nov. 30, 1989.]

In re WANOMI P., a Person Coming Under the Juvenile Court Law.
LOS ANGELES COUNTY DEPARTMENT OF CHILDREN'S SERVICES, Plaintiff and Appellant, v.
MARY P. et al., Defendants and Respondents;
DONALD JAMES GEISLER et al., Interveners and Appellants.

COUNSEL

De Witt W. Clinton, County Counsel, and Charles W. Nickell for Plaintiff and Appellant.

Randall B. Hicks for Interveners and Appellants.

Jill M. Bojarski, under appointment by the Court of Appeal, and Jaime M. Cervantes for Defendants and Respondents.

OPINION

HANSON, J.—

## INTRODUCTION

This case involves the custody of a minor born in California to a mother who is a member of a Canadian Indian tribe. It calls upon us to determine whether the Indian Child Welfare Act (25 U.S.C. § 1901 et seq.) requires the California courts to transfer jurisdiction over the minor to the Canadian Indian tribe.

## FACTS

On September 10, 1987, the Los Angeles County Department of Children's Services (the petitioner) filed a Welfare and Institutions Code section 300 petition alleging that a minor, Wanomi P. (the minor), born August 13, 1987, came within the provisions of section 300, paragraph 1, subdivision (a) in that the minor had no parent or guardian capable of and actually exercising proper, effective parental care and control and needed such care and control. The petition further alleged that the minor had lived in the hospital since his birth three weeks earlier; the minor's mother, whose true name is Mary P. (Mary), was intellectually impaired, making her unable to care for the minor properly; the minor had unique medical problems requiring a high level of parenting skills, including colostomy care; the minor's mother was transient and had no permanent residence in which to care for

the minor; and the identity and whereabouts of the minor's father and his interest in and ability to care for the minor remained unknown.

The petition stated that the child might be an Indian child as defined by the Indian Child Welfare Act (the ICWA). The Mic Mac Nation (Mic Mac Nation) of Nova Scotia, Canada, eventually appeared and sought custody of and jurisdiction over the minor.

On September 11, 1987, the trial court found that a prima facie case for detaining the minor and showing that the minor was a person described by section 300 was established. It further found that a substantial danger to the minor's physical/emotional health existed. The trial court ordered detention of the minor.

The petitioner prepared an assessment. Mary was born March 14, 1953, in Sydney, Nova Scotia, Canada. At age two years, Mary's mother physically abused her, causing broken bones and a skull fracture that brought her near death and required hospitalization for several months. At age nine, Mary was placed in an orphanage because her father had injured his back and could not provide for the children. The oldest child, she has three brothers and one sister. The parents are now deceased.

Mary dropped out of the seventh grade but received her general education degree in Boston. She lived in a foster home from age 9 to 17 or 18. She was married to James Andross but they divorced after five years, with no children. She returned to Canada, worked waiting and bussing tables, and had a daughter, Monica P., on April 2, 1979. She had another child, but would not reveal its name or birth date to petitioner. Mary claimed both children were taken from her because of her history of having been abused.

The assessment stated that Mary is a member of the Mic Mac tribe in Sydney, Nova Scotia, Canada, tribal band number 180. She claimed she had come to the United States alone about a year earlier, was raped twice, and did not know the identity of the minor's father.

Shortly after birth, the minor was found to have a hole in his intestine. Minor surgery, involving a colostomy, corrected the problem. The colostomy was anticipated to be temporary, and the minor seemed well in other respects.

The assessment stated reasons for its recommendation as follows. The minor was before the court because it appeared Mary was brain damaged and incapable of caring for an infant with serious medical problems. Since arriving in California alone about a year earlier, Mary had no job or shelter

before staying at the Bible Tabernacle. The abuse she sustained as a child, especially the skull fracture, may have produced the brain damage that the report stated was "apparent to all who deal with mother," citing slow thought processes and ceasing to talk about a topic in midsentence and having to be reminded of the topic. Although the Bible Tabernacle is "notoriously liberal regarding mothers and their children," the shelter did not want the minor released to Mary because they did not feel she could care for a baby.

Mary withheld information about her two or three other children residing in Massachusetts or Nova Scotia. Although claiming to be a member of the Mic Mac tribe, tribal band No. 180, Mary did not want the tribe involved. The petitioner had contacted Jimmy Sam, of the Bureau of Indian Affairs, to search for the tribe and verify the mother's membership in it.

Petitioner concluded that the mother was brain damaged and could not care for a young child with physical problems. Petitioner felt that the fact that Mary's two other children may have been taken from her did not augur well for her ability to care for the minor.

Mary contacted the Christian Adoption and Family Services and chose Donald James Geisler and Deborah Geisler (the Geislers) as adoptive parents for the minor. The Geislers met Mary several times, saw and fed the baby in the hospital, but later learned that Mary had changed her mind and did not wish to adopt. The Geislers, however, desired to adopt the minor, and hoped the minor could stay with them pending further orders of the court. The Geislers applied for a foster care license.

In a report dated November 19, 1987, the petitioner stated that Mary's whereabouts were unknown. She had left the Bible Tabernacle Shelter on November 6, 1987. No confirmation of her membership in the Mic Mac tribe had yet been made. She had not visited the minor, who was still with the Geislers, but did send a Halloween card and a pair of socks.

Petitioner's report dated December 16, 1987, added no new information. In a February 24, 1988, report, petitioner stated that the Mic Mac tribe had been notified of the hearing date. The tribe desired to have the minor returned to Nova Scotia and placed with a Mic Mac family. A letter from the Mic Mac tribe stated that Mary had a long history of mental problems, and had been diagnosed as a schizophrenic.

The minor, who had lived with the Geislers for several months, had bonded with them. The Geislers wished to keep and eventually adopt the minor. Two of Mary's children, Monica and William, are in foster homes

and not with tribal families. Mary had appeared at Hollywood Presbyterian twice, appearing to someone on the staff to have psychological problems. An intern at USC Alternatives confirmed that Mary had been there for a few days, allegedly pregnant with a nonviable fetus. On January 12, 1988, Mary, angered, had thrown a cup of coffee against a wall, and it was decided not to allow her to continue to live there. USC Alternatives arranged for Mary's sister, in Nova Scotia, to send her money to return. Somehow the check got into Mary's hands. She cashed the check and left rather than using it to buy a bus ticket, and remained in Southern California.

Mary had visited with the minor once, on January 10, 1988, when the Geislers took him to USC Alternatives.

The trial court admitted into evidence a declaration of Mary P. dated June 10, 1988, declaring under penalty of perjury that she was a registered member of the Membertou Indian Nation of Sydney, Nova Scotia, and a Canadian citizen and that it was her intent to return to Canada, her "permanent residence and domicile," and reside with the Mic Mac Nation.

On June 23, 1988, the trial court denied the Geislers' motion for standing to appear in the case.

The trial court filed a statement of decision and judgment on July 14, 1988. Its findings of fact stated that Mary was a Canadian citizen, a registered Indian, and a member of the Membertou Indian Band of the Mic Mac Nation in Nova Scotia, Canada, within the meaning of the Indian Act, chapter 27, Statutes of Canada (1985). The minor was entitled to be registered as an Indian in Canada in accordance with the Indian Act. Mary desired the trial court to decline jurisdiction and release the minor to the Mic Mac Nation for placement with a native family in Canada. Mary's permanent residence is in the Membertou Indian Nation, Sydney, Nova Scotia, Canada; the Mic Mac tribes in Canada are branches of the Membertou tribe. Mary had been physically present in the Los Angeles area for approximately one and one-half years.

The trial court further found that the Treaty of Watertown, the Treaty of Amity, Commerce and Navigation (the Jay Treaty of 1794) and the Treaty of Ghent between the United States and Canada regulate Indian relations between the two nations. The United States recognized the Mic Mac Indian Nation from Maine in the Watertown Treaty of 1776, still in force. The Mic Mac Nation recognized the minor as a member of their nation and requested the minor's release to the nation. The commerce clause of the United

States Constitution grants Congress plenary power over Indian Affairs and forms the basis for the ICWA.

The trial court declared it United States policy to foster the unique values of Indian culture. It further stated that Indian tribes are sovereigns predating the United States Constitution and American courts recognize a trust relationship between the United States and the Indian nations. The Legislature has enacted regulations to ensure protection of the special status of Indian nations. The Mic Mac Nation constitutes an Indian tribe in both a racial and cultural sense since at least 1776, has had a long affiliation with the United States, and provided military support during the American revolution. The Mic Mac tribe from Maine and the Mic Mac tribe from Nova Scotia, however, are not registered with the Secretary of the Interior.

The trial court ordered that the minor be returned to the Mic Mac in Canada; stated that the ICWA protects the Mic Mac tribe; and declared that the trial court did not have further jurisdiction since the Mic Mac tribe had complied with all requirements for exercise of jurisdiction under the ICWA. The trial court granted a 30-day stay to permit cocounsel to seek a writ of review, with the minor to be returned to the Indian tribe unless the Court of Appeal issued a stay.

The Court of Appeal denied petitioner's writ of mandate, but granted a petition for writ of supersedeas and stayed the order sending the minor to Canada.

As part of a motion for remand filed July 10, 1989, which was denied, Mary, through her attorney, filed a declaration stating that she had reconsidered her position before the trial court and concluded that it would be severely detrimental to the minor, both physically and emotionally, if he were placed under the tribal court's jurisdiction. She declared that she had been informed that if the minor were returned to Canada, he would be placed in a foster home rather than being returned to her. She declared that since the minor had spent virtually all of his life with the Geislers, she believed it would be emotionally damaging to him to be removed from the only home he knows and placed with strangers. Having herself been raised in foster homes and suffered both physically and emotionally as a result, Mary declared that she did not want that for her child and believed him to be better off with the Geislers, whom he knows and loves. She further declared that the minor was born in Los Angeles at a time when she considered it to be her place of residence, and that the minor had never lived on the Mic Mac reservation.

The petitioner and the Geislers jointly filed a notice of appeal on August 11, 1988. The Geislers have submitted an opening and a reply brief; Mary

P. and the Mic Mac Nation, separately represented by counsel, have submitted respondents' briefs. On November 10, 1989, the Geislers filed a "Medical Update Regarding the Minor" with this court in which the minor's physician described the minor's continuing medical problems resulting from congenital gastrointestinal disease. These problems have required numerous surgical and therapeutic procedures, and the minor's physician stated that he believed it would be in the minor's best interest, medically and psychologically, to remain in the Geislers' care.

ISSUES

On appeal the Geislers claim that the trial court:

1. Erroneously found that the Indian Child Welfare Act applied to the Mic Mac Indian Tribe of Nova Scotia, Canada, and that it had no subject matter jurisdiction over the minor; and that

2. Erroneously found that it had no jurisdiction over the minor; and

3. Erroneously found that it lacked jurisdiction to hear their motion for standing.

DISCUSSION

The Geislers on appeal claim that the trial court erroneously found that the ICWA applied to the Mic Mac Indian Tribe of Nova Scotia, Canada, and erroneously found that the court lacked subject matter jurisdiction.

The trial court relied upon the statement of exclusive jurisdiction in 25 United States Code section 1911 (a): "An Indian tribe shall have jurisdiction exclusive as to any State over any child custody proceeding involving an Indian child who resides or is domiciled within the reservation of such tribe, except where such jurisdiction is otherwise vested in the State by existing Federal law. Where an Indian child is a ward of a tribal court, the Indian tribe shall retain exclusive jurisdiction, notwithstanding the residence or domicile of the child." Noting that the statute distinguishes conceptually between "domicile" and "residence" by using those terms in the disjunctive, the trial court asserted that an Indian child may be located physically off the reservation but still be domiciled within, citing *Matter of Appeal in Pima County* (1981) 130 Ariz. 202 [635 P.2d 187].

The trial court also stated that in 1776 the Mic Mac Nation concluded a treaty with the Commonwealth of Massachusetts. Although an unpublished treaty, the trial court asserted that it remains a legally recognized document, one of the first international treaties in American history, which

Massachusetts renewed and reenacted in 1987. The trial court stated, "The Mic Macs have a special relationship with the United States as they were the first Indian nation to be recognized by the United States." The trial court noted that a small Mic Mac community in Maine "is currently proceeding with a petition for federal recognition with the Secretary of the Interior. Should this recognition status be granted all Mic Macs would be covered under the eligibility requirements of the ICWA."

The trial court acknowledged that the list of Indian tribes officially recognized as entitled to services set forth in the Federal Register does not include the Mic Mac Nation as a recognized tribe to receive services from the Bureau of Indian Affairs. Despite this omission, the trial court reasoned as follows. "This Court finds that the exclusion of the Mic Mac Nation was not intended to be all inclusive for two reasons: First a denial of any Bona Fide Tribe from the special status of Indians would be a denial of equal protection of the law as an arbitrary classification; secondly, the Mic Mac Nation, is a Tribe of Indians partially located in the State of Maine is a part of the same Mic Mac Nation also located in Canada. The status of the said Tribe, by virtue of the Treaty of the Watertown Treaty, Wednesday, July 17, 1776, and having been recognized by Congress as recent as June 22, 1987 (Exhibit D, brief submitted by Betty G. Barrington). In addition thereto the Treaty of Ghent, (Exhibit B, same brief) and the Treaty of Amity, Commerce and Navigation (Exhibit A, same brief) clearly grants to the Mic Mac Tribe of Canada the same status as the Indian Tribes in the USA and said tribe is entitled to the same protective umbrella that is recognized by the U.S. Government." [*Sic.*]

■ The jurisdictional ruling in a Welfare and Institutions Code section 300 proceeding is subject to our review to determine whether substantial evidence supports the lower court's conclusions sitting as a trier of fact. (*In re Katrina C.* (1988) 201 Cal.App.3d 540, 547 [247 Cal.Rptr. 784].) The case at bench, however, also requires our scrutiny of relevant statutes, on whose construction we may rule as a matter of law.

Title 25 United States Code section 1911(a) gives an Indian tribe exclusive jurisdiction as to any state in:

a. a child custody proceeding

b. involving an Indian child

c. residing or domiciled

d. within the reservation of such Indian tribe.

■ CHILD CUSTODY PROCEEDING: A Welfare and Institutions Code section 300 proceeding is a "child custody proceeding," since it may result

in foster care placement, termination of parental rights, or preadoptive or adoptive placement as enumerated and defined in 25 United States Code section 1903(1).

INVOLVING AN INDIAN CHILD: 25 United States Code section 1903(4) defines an "Indian child" as "any unmarried person who is under age eighteen and is either (a) a member of an Indian tribe or (b) is eligible for membership in an Indian tribe and is the biological child of a member of an Indian tribe."

Title 25 United States Code section 1903(8), defines an "Indian tribe" to mean "any Indian tribe, band, nation, or other organized group or community of Indians recognized as eligible for the services provided to Indians by the Secretary because of their status as Indians, including any Alaska Native village as defined in section 1602(c) of Title 43."

RESIDENCE AND DOMICILE: 25 United States Code section 1903 does not define residence and domicile, but *Mississippi Band of Choctaw Indians* v. *Holyfield* (1989) 490 U.S. 30, 48 [104 L.Ed.2d 29, 46, 109 S.Ct. 1597, 1608], adjudicating this aspect of the ICWA, states generally that adults establish domicile by "physical presence in a place in connection with a certain state of mind concerning one's intent to remain there."

WITHIN THE RESERVATION OF SUCH INDIAN TRIBE: 25 United States Code section 1903(10) defines "reservation" to mean "Indian country as defined in section 1151 of Title 18 and any lands, not covered under such section, title to which is either held by the United States in trust for the benefit of any Indian tribe or individual or held by any Indian tribe or individual subject to a restriction by the United States against alienation."

Given these statutory rules and definitions, the trial court erroneously found that the Indian Child Welfare Act deprived it of jurisdiction in the case at bench.

First, as the trial court found, neither the Mic Mac tribe of Maine nor the Mic Mac tribe of Nova Scotia is registered with the Secretary of the Interior or recognized by the Secretary as eligible for services provided to Indians. 51 Code of Federal Regulations section 131, Thursday, July 10, 1986, lists "Indian Tribal Entities Recognized and Eligible to Receive Services from the United States Bureau of Indian Affairs." Neither Mic Mac tribe appears on that list, which was before the trial court. 25 Code of Federal Regulations section 83.6(b) requires the Secretary of the Interior to publish in the Federal Register a list of all Indian tribes which are recognized and receiving services from the Bureau of Indian Affairs, and to update and publish

that list annually. The latest list, published December 29, 1988, does not include the Mic Mac Nation. (53 Fed.Reg. 52829.)

The Department of the Interior must acknowledge tribal existence as a prerequisite to the protection, services, and benefits from the federal government available to Indian tribes. "Such acknowledgment shall also mean that the tribe is entitled to the immunities and privileges available to other federally acknowledged Indian tribes by virtue of their status as Indian tribes as well as the responsibilities and obligations of such tribes." (25 C.F.R. § 83.2.)

Title 25 Code of Federal Regulations section 83 sets forth "Procedures for Establishing that an American Indian Group Exists as an Indian Tribe." Section 83.1(f), states that "Indian tribe" means "any Indian group *within the continental United States* that the Secretary of Interior acknowledges to be an Indian tribe." As described in Title 25 Code of Federal Regulations section 83.3(a), part 83 "is intended to cover only those *American Indian groups indigenous to the continental United States* which are ethnically and culturally identifiable, but which are not currently acknowledged as Indian tribes by the Department." Section 83.4, entitled "Who may file," states that "[a]ny Indian group *in the continental United States*" believing it should be acknowledged as a tribe and satisfying statutory criteria can petition the Secretary. (Italics added.)

In the case at bench no authority has been cited that would make possible the conclusion that the ICWA applied to a Canadian or other foreign Indian tribe.

Title 25 United States Code section 1903(8) refers to an "Indian tribe" as "any Indian tribe, band, nation, or other organized group or community of Indians recognized as eligible for the services provided to Indians by the Secretary because of their status as Indians. . . ." The Mic Mac Nation argues that this "recognition" is to be contrasted with the "acknowledgement" of tribal status referred to in 25 Code of Federal Regulations section 83. ▉ *James* v. *U.S. Dept. of Health and Human Services* (D.C. Cir. 1987) 824 F.2d 1132, 1136-1137, however, rejected this distinction, holding that the executive branch of the federal government, not the judicial branch, makes initial determinations of whether groups have been or will be accorded federal recognition as American Indian tribes. Contrary to the Mic Mac Nation's argument on appeal, the Secretary of the Interior has the power to create reasonable classifications and eligibility requirements that are rational, proper, duly published, consistent with governing legislation, and consistently followed by the administrative agency. (*Morton* v. *Ruiz* (1974) 415 U.S. 199, 230-236 [39 L.Ed.2d 270, 291-295, 94 S.Ct. 1055].)

■ Secondly, the trial court made no finding that the Mic Mac tribe of Nova Scotia, Canada, lives on a "reservation," and in any case foreign territory could not qualify as a "reservation" as defined by 25 United States Code section 1903(10). It is not "Indian country" defined by 18 United States Code section 1151 and subject to United States law. "Except as otherwise provided in sections 1154 and 1156 of this title, the term 'Indian country,' as used in this chapter, means (a) all land within the limits of any Indian reservation *under the jurisdiction of the United States Government,* notwithstanding the issuance of any patent, and, including rights-of-way running through the reservation, (b) all dependent Indian communities *within the borders of the United States* whether within the original or subsequently acquired territory thereof, and whether within or without the limits of a state, and (c) all Indian allotments, the Indian titles to which have not been extinguished, including rights-of-way running through the same." (Italics added.)

Thirdly, because the Mic Mac tribe has not been recognized as an Indian tribe, the minor is not an "Indian child" as defined by the Indian Child Welfare Act (25 U.S.C. § 1903(4).) Because the case at bench does not involve an Indian child, neither section 1911(a), nor section 1911(b) (applying to an "Indian child" not residing or domiciled on a reservation of the Indian child's tribe) removes jurisdiction from the State of California.

Fourth, the minor was neither resident of nor domiciled in an Indian reservation. *Matter of Adoption of Baby Boy L.* (1982) 231 Kan. 199 [643 P.2d 168, 175] stated that "the overriding concern of Congress and the proponents of the Act was the maintenance of the family and tribal relationships existing in Indian homes and to set minimum standards for the removal of Indian children from their existing Indian environment." The case at bench does not present that situation. The minor's father remains unknown. Mary, the mother, had not been domiciled nor had resided on an Indian reservation during pregnancy, at the time the minor was born, or as late as June 10, 1988, nearly 10 months after the minor's birth, at which time in a declaration sworn in California she declared her intent to return to Canada.

Regulating the unwarranted removal of children from Indian families by nontribal public and private agencies was among the objectives of the ICWA as stated in the legislative findings. (25 U.S.C.A. 1901(4).) No evidence suggested the existence of an "Indian home" existed from which the minor was "removed." (See *Claymore* v. *Serr* (S.D. 1987) 405 N.W.2d 650: For a tribal court to have exclusive jurisdiction over a child custody proceeding involving Indian child, under the ICWA the child must be member of an existing Indian family.)

"In effect, Congress used the domicile of the child as a basis for distinguishing between those who maintain close ties with the tribe and, therefore, should be subject to its exclusive control and those who are sufficiently removed from the tribe and its ways to justify giving jurisdiction over them to non-Indian courts in certain circumstances." (*Matter of Adoption of Halloway* (Utah 1986) 732 P.2d 962, 968.)

 Noting that the ICWA does not define "domicile," the United States Supreme Court has reviewed the concepts of residence and domicile. The terms are not necessarily synonymous; a person can reside in one place while domiciled in another. For adults physical presence in a place plus an intent to remain establishes domicile. Because minors usually lack the legal capacity to form the intent required, their parents determine their domicile. An illegitimate child has traditionally taken its mother's domicile. (*Mississippi Band of Choctaw Indians* v. *Holyfield, supra,* 490 U.S. 30 at p. 48 [104 L.Ed.2d 29 at p. 46, 109 S.Ct. 1597 at p. 1608].)

In *Holyfield,* the court held that where both the mother and father of twin infants were enrolled members of an Indian tribe, and the parents were residents and domiciliaries of the tribe's reservation in Neshoba County, Mississippi, the twins were at birth also domiciled on the reservation, even though they had been born outside, and had never visited, the reservation. *Holyfield* characterized the ICWA as placing the decision about determining custody of Indian children domiciled on the reservation in the hands of the tribal court. (*Id.* at pp. 48-53 [104 L.Ed.2d at pp. 46-49, 109 S.Ct. at pp. 1608-1611].)

In *Holyfield,* both parents were "reservation-domiciled tribal members." (*Id.* at p. 53 [104 L.Ed.2d at p. 49, 109 S.Ct. at p. 1610].) In the case at bench, the record contains no evidence that a reservation as defined by the ICWA exists for the Mic Mac or Membertou tribes, nor does it contain evidence that Mary established domicile or residence on such a reservation. Her June 10, 1988, declaration states only that she is a Canadian citizen, that she is a member of the Membertou Indian Nation of Sydney, Nova Scotia, and that "[i]t is my intent to return to Canada, which is my permanent residence and domicile, and reside with the Mic Mac Indian Nation."

 The trial court's findings do not include a finding that Mary established domicile on a reservation. Only where an Indian child resides or is domiciled within the reservation of an Indian tribe (as defined by § 1903) does section 1911(a) of the ICWA establish exclusive jurisdiction in tribal courts. (*Mississippi Band of Choctaw Indians* v. *Holyfield, supra,* 490 U.S. 30 at p. 36 [104 L.Ed.2d 29 at p. 38, 109 S.Ct. 1597 at p. 1601]; see also *B.R.T.* v. *Executive Director of S.S. Bd. N.D.* (N.D. 1986) 391 N.W.2d 594,

598-599: state court properly exercised jurisdiction in custody proceeding on undisputed evidence that mother and child resided and were domiciled off the reservation; *In re Interest of Bird Head* (1983) 213 Neb. 741 [331 N.W.2d 785, 790]: evidence that minor resided off reservation supported denial of transfer of proceedings to Indian tribe; and *Matter of Adoption of T.R.M.* (Ind. 1988) 525 N.E.2d 298, 306: mother and child not domiciled on the reservation precluded tribal exercise of exclusive jurisdiction.)

As to the claim that treaties may constitute recognition of tribal status, the trial court relied upon three such treaties. The statement of decision and judgment describes the Treaty of Watertown 1776 to "confer special status on the Mic Mac Nation." Because that treaty remains "unpublished," it was not properly before either the trial court or this court. Moreover, its signatories were apparently the Mic Mac Nation and the Commonwealth of Massachusetts. Absent some authority to the contrary, the latter party would not have bound the United States federal government before it existed. The parties to the Treaty of Amity, Commerce and Navigation (1794) and the Treaty of Ghent (1814) were the United States and the United Kingdom. It is likewise questionable whether either treaty was properly part of the record before the trial court. In any case, neither treaty mentions the Mic Mac Indian tribe or supports the trial court's erroneous conclusion that such treaties "regulate Indian relations between the United States and Canada" in any way affecting the case at bench. The connection between these 18th and early 19th century treaties and the issues raised by the case at bench remains tenuous at best. As against dubiously relevant historical documents, we must defer to recent legislation that specifically addresses issues presented by this case.

The Mic Mac Nation argues that it is a sovereign nation, with its own government, and that these dealings by treaty constitute recognition of the Mic Mac Nation by the United States federal government. ■ The ICWA accords rights, procedures, and responsibilities only to recognized Indian tribes within the 48 continental United States. The concept of sovereignty does not convert a Canadian Indian tribe to one coming within the scope of United States law. The ICWA does not employ sovereignty to determine what entities fall within its scope. Indian tribal sovereignty, as defined by United States law, in any case depends on and is subordinate to the United States federal government. (*Washington* v. *Confederated Tribes* (1980) 447 U.S. 134, 154 [65 L.Ed.2d 10, 29, 100 S.Ct. 2069].)

■ Welfare and Institutions Code section 300 sets forth the specific circumstances relating to the juvenile court's acquisition of jurisdiction over a minor child in a dependency proceeding. Even more fundamentally, the California courts have jurisdiction over the minor in the case at bench

because he was (1) born in California, (2) is an American citizen, and (3) has resided in California his entire life. Presence, residence, and citizenship all confer jurisdiction over an individual upon a state court. (Rest.2d Conflict of Laws, § 27.) Any one of these bases supports the juvenile court's jurisdiction over this minor.

■ The Geislers also claim error in the trial court's finding that it had no jurisdiction to hear their motion for standing. We agree with the Geislers. *In re B.G.* (1974) 11 Cal.3d 679, 692-693 [114 Cal.Rptr. 444, 523 P.2d 244] holds that de facto parents, i.e., those assuming the role of parent, raising the child in their home, and thereby acquiring an interest in the child's care, companionship, custody, and management should be permitted to appear as parties in juvenile court proceedings.[1]

■ We conclude that the trial court erroneously ruled that the ICWA deprived the California courts of jurisdiction in the case at bench. This case does not meet the requirements for ICWA jurisdiction, and we reverse the trial court's ruling and remand the case with directions for the trial court to accept jurisdiction, and to proceed, under California law.

### DISPOSITION

We reverse and remand the case with directions for the trial court to accept jurisdiction, and to proceed, under California law.

Spencer, P. J., and Devich, J., concurred.

Respondents' petition for review by the Supreme Court was denied February 21, 1990.

---

[1] Although we have determined that the case at bench does not fall under the ICWA, even if it were to do so the act's provisions appear to support the minor's placement with the Geislers. The facts and circumstances of this case would appear to support a determination by the lower court that continued custody of the minor by the parent is likely to result in serious emotional or physical damage to the child. (25 U.S.C. § 1912(e) & (f).) Even the mother's initial consent to foster care placement or to termination of parental rights, followed by her withdrawal of that consent, and her subsequent revocation of that withdrawal of consent coupled with her declaration that she believes the minor would be better off emotionally and physically with the Geislers, with whom he has lived since within a few days of his birth, would appear to support the conclusion that the mother has voluntarily terminated her parental rights under 25 United States Code section 1913. Our conclusion that the ICWA does not govern the case at bench, however, means that its provisions do not form the basis for the trial court's future determinations of these issues.