Matter of Baby Boy C. (2004 NY Slip Op 24302)

Matter of Baby Boy C.

2004 NY Slip Op 24302 [5 Misc 3d 377]

August 24, 2004

Family Court, New York County

Published by New York State Law Reporting Bureau pursuant to Judiciary Law § 431.

As corrected through Wednesday, November 24, 2004

[*1]
In the Matter of the Adoption of Baby Boy C.
Family Court, New York County, August 24, 2004

APPEARANCES OF COUNSEL

Rosin & Reiniger, New York City (Benjamin Rosin of counsel), for Tohono O'odham Nation. Magovern & Sclafani, New York City (Frederick Magovern of counsel), for adoptive parents. Alexander Carlin, New York City, guardian ad litem.

{**5 Misc 3d at 378} OPINION OF THE COURT

Mary E. Bednar, J.
This decision addresses the applicability of the Indian Child Welfare Act (25 USC § 1901 et seq. [ICWA]) to the instant private adoption proceedingan issue which has rarely been written on in New York State. The subject child was born in Arizona on March 22, 2004, and the adoptive parents took almost immediate possession of him. The child has been living with the adoptive parents ever since.
On April 13, 2004 the child's mother and father signed extrajudicial consents in Arizona to the adoption of the child by the adoptive parents. Attached to the mother's extrajudicial consent is an affidavit which, in part, states: "My religion is none but the adoptive child has not been baptized into any religion. It is my understanding that Joshua and Jeffrey are Jewish and the adoptive child's religious affiliation of training will probably be Jewish. I have no preference with respect to the adoptive child's religious affiliation, and approve and agree that the adoptive child be brought up in the Jewish faith." On April 26, 2004 the biological parents signed a judicial surrender before a judge of the Cocino County Superior Court of Arizona.
On May 25, 2003 the Tohono O'odham Nation informed me by letter that the child's mother is a registered member of the tribe[FN1]

and that the child is eligible for membership in the Tohono O'odham Nation. The letter stated that the tribe was opposed to the instant adoption and that the ICWA should apply to these proceedings. Anticipating that the tribe would move to intervene, I assigned a social worker to assess the adoptive parents' household.{**5 Misc 3d at 379}
On June 25, 2004 the tribe filed a motion to intervene and the adoptive parents filed an affirmation in opposition to intervention. The tribe subsequently filed answering papers, which [*2]were in turn answered by the adoptive parents. The adoptive parents also filed a motion to have the tribe's attorney, Ben Rosin, Esq., disqualified from these proceedings, because one of the parents interviewed Mr. Rosin by telephone while looking for an attorney to represent him, and claims to have conveyed confidential information during the conversation. Mr. Rosin asserts that in their conversation they only talked about the case in general terms, and that no confidential information was revealed.
The social worker has filed her report, which concludes that the child is well taken care of. I have assigned a guardian ad litem to represent the child's best interests.
The ICWA (25 USC § 1901 et seq.) was passed by the United States Congress in 1978 "to protect the best interests of Indian children and to promote the stability and security of Indian tribes and families . . ." (25 USC § 1902). Congress recognized "that there is no resource that is more vital to the continued existence and integrity of Indian tribes than their children" (25 USC § 1901 [3]).
The ICWA gives Indian tribes the right to intervene "[i]n any state court proceeding for the . . . termination of parental rights to[ ] an Indian child." (25 USC § 1911 [b].) Termination of parental rights is defined as "any action resulting in the termination of the parent-child relationship." (25 USC § 1903 [1] [ii].) The act imposes guidelines for the voluntary relinquishment of parental rights (25 USC § 1913) and mandates that "[i]n any adoptive placement of an Indian child under State law, a preference shall be given, in the absence of good cause to the contrary" to a placement with an Indian family. (25 USC § 1915 [a].)
In their memorandum of law the adoptive parents contend that the ICWA does not apply in this case because the child's mother neither developed an Indian identity nor involved herself with the Tohono O'odham Nation. In making this argument the adoptive parents ask that I apply the so-called existing Indian family doctrine (EIF), which "precludes application of the ICWA when the Indian child's parent . . . ha[s] not maintained a significant social, cultural, or political relationship with . . . her tribe." (Matter of Baby Girl S., 181 Misc 2d 117, 122 [Sur Ct, Westchester County 1999] [internal quotation marks omitted].){**5 Misc 3d at 380} The adoptive parents claim that Congress' acceptance of the EIF doctrine can be read into its 1987 rejection of amendments to the ICWA, which would have negated the doctrine.
The adoptive parents next contend that the ICWA is inapplicable here because the biological mother wants the children raised in the Jewish faith, which is the biological father's religion. They interpret Social Services Law § 373which requires that New York courts try to place adoptive children with caretakers who share the same religion as the childrenas mandating that the subject child be placed in a Jewish home. The adoptive parents also claim that the ICWA is inapplicable to private placement adoptions and that application of the ICWA under the facts at bar would violate the Fifth, Tenth and Fourteenth Amendments of the US Constitution.
The tribe seeks to intervene pursuant to 25 USC § 1911, as the proceedings could result in the termination of the parent-child relationship. In their response papers the tribe notes that cases which favor the EIF doctrine are only persuasive authority, and they urge me to follow cases from foreign jurisdictions which reject the doctrine. The tribe moves in the alternative that intervention be allowed through Civil Practice Law and Rules § 1013.
The tribe counters the adoptive parents' argument concerning Social Services Law § 373 by claiming [*3]that Jewish law does not recognize the child as Jewish, since the mother is gentile. The tribe goes on to aver that Congress' failure to adopt the 1987 amendments is insufficient proof of its intent regarding the EIF doctrine. They address the adoptive parents' constitutional objections by noting that several courts have rejected this line of attack.
I find that the ICWA is implicated in this case because the parental consents would be invalidated if the ICWA applied (see, 25 USC § 1913), making this a proceeding to terminate parental rights (cf., Matter of J.B., 900 P2d 1014 [Okla 1995] [where tribe was prohibited from intervening since state court executed the termination of parental rights in accordance with the ICWA, meaning that the proceeding could no longer be one to terminate parental rights]). The question presented, thus, is whether the EIF doctrine applies to the instant matter.
The EIF doctrine was announced in Matter of Adoption of Baby Boy L. (231 Kan 199, 643 P2d 168 [1982]), which involved a non-Indian mother and an Indian father who had no connection to Indian life. The mother put her child up for adoption shortly {**5 Misc 3d at 381}after birth, the father's rights were terminated (presumably not in accordance with the ICWA), and the tribe asked to intervene. The trial court ruled that the ICWA was inapplicable, and the tribe appealed. The appeals court affirmed. In so doing they reasoned:
"A careful study of the legislative history behind the Act and the Act itself discloses that the overriding concern of Congress . . . was the maintenance of the family and tribal relationships existing in Indian homes and to set minimum standards for the removal of Indian children from their existing Indian environment. It was not to dictate that an illegitimate infant who has never been a member of an Indian home or culture, and probably never would be, should be removed from its primary cultural heritage and placed in an Indian environment over the express objections of the non-Indian mother." (Baby Boy L., supra, 231 Kan at 205-206, 643 P2d at 175.)
Some cases following Baby Boy L. have highlighted its suggestion that the ICWA's viability in a given situation turns on whether or not the child would likely end up in an Indian environment if the act were applied (see, Matter of Adoption of Crews, 118 Wash 2d 561, 825 P2d 305 [1992]). Other courts relying on Baby Boy L. looked only at the Indian parent's relationship with their Indian heritage (In re Morgan, 1997 WL 716880, 1997 Tenn App LEXIS 818 [Tenn Ct App, Nov. 19, 1997]). Either way, most of the cases invoking the EIF doctrine have reasoned that the exception reflects Congress' intent when it passed the ICWA (see, C.E.H. v L.M.W., 837 SW2d 947 [Mo 1992]; Claymore v Serr, 405 NW2d 650 [SD 1987]; Matter of S.C., 833 P2d 1249 [Okla 1992]; Matter of Adoption of D.M.J., 1985 OK 92, 741 P2d 1386 [1985]; Hampton v J.A.L., 658 So 2d 331 [La 1995]; S.A. v E.J.P., 571 So 2d 1187 [Ala 1990]; Matter of Adoption of T.R.M., 525 NE2d 298 [Ind 1988]).
The only New York case to address the EIF doctrine, Matter of Baby Girl S. (181 Misc 2d 117 [Sur Ct, Westchester County 1999]), has facts similar to the case at bar. Baby Girl S. involved an 11-month-old Indian child given up for adoption to a non-Indian couple soon after birth. When the child's tribe asked to intervene under the ICWA the court reasoned:
"The court is persuaded that the ICWA was not intended to apply in circumstances such as these, where: (1) the mother does not live on the reservation,{**5 Misc 3d at 382} has voluntarily consented to the adoption [*4]of her daughter who she relinquished at birth and objects to the intervention of the tribe; (2) the putative father is non-Indian, has not demonstrated any connection to the tribe or to the Indian way of life; and (3) the infant has lived with her prospective adoptive parents throughout these proceedings." (Baby Girl S., supra at 125.)
While denying intervention under the ICWA, the court allowed the tribe to intervene pursuant to CPLR 1013.
The United States Supreme Court addressed the ICWA's jurisdictional reach in Mississippi Band of Choctaw Indians v Holyfield (490 US 30 [1989]). In Holyfield an Indian mother who lived on a reservation gave birth to twins away from reservation grounds. The mother and the children's father, who also lived on the reservation, voluntarily surrendered the children for adoption by non-Indian caretakers. The children's tribe moved to vacate the adoption and, pursuant to the ICWA, have the custody issue heard in a tribal court. The Supreme Court ruled that even though the children were born off of reservation grounds, they were still domiciled on the reservation, meaning that their adoption case should have been heard by a tribal court. In his decision Justice Brennan wrote: "Congress was concerned not solely about the interests of Indian children and families, but also about the impact on the tribes themselves of the large numbers of Indian children adopted by non-Indians." (Holyfield at 49.)
Although Holyfield does not discuss the EIF exception, courts have cited the case as authority for the notion that the doctrine is bad law, because it conflicts with the emphasis Justice Brennan placed on the tribe's interests. (See, Matter of Adoption of Baade, 462 NW2d 485 [SD 1990]; Quinn v Walters, 117 Or App 579, 845 P2d 206 [1993]; Matter of Baby Boy Doe, 123 Idaho 464, 849 P2d 925 [1993]; Michael J., Jr. v Michael J., Sr., 198 Ariz 154, 7 P3d 960 [2000]; In re Elliot, 218 Mich App 196, 554 NW2d 32 [1996].) But an analysis of Holyfield which focuses on its language about the tribe's interests under the ICWA extends Holyfield too far. "Holyfield stands for two propositions: (1) that federal law pre-empts state law as to the definition of domicile, and (2) the domicile of an Indian child is that of the mother if the child is born out of wedlock." (Matter of S.C., 833 P2d 1249, 1254 [Okla 1992].)
Weighing the interests of the tribe in cases involving Indian children has been the focus of courts analyzing the constitutionality{**5 Misc 3d at 383} of the ICWA. The California cases In re Bridget R. (41 Cal App 4th 1483, 49 Cal Rptr 2d 507 [1996]), In re Alexandria Y. (45 Cal App 4th 1483, 53 Cal Rptr 2d 679 [1996]), and Crystal R. v Superior Ct. (59 Cal App 4th 703, 69 Cal Rptr 2d 414 [1997]), which were extensively discussed in the adoptive parents' memorandum, address the constitutionality issue.
In Bridget R. an Indian father tried to gain custody of his two-year-old daughter, who had spent her entire life with an adoptive family. The father, who had no connection to Indian culture, had consented to the adoption under state law. The trial court, applying the ICWA, invalidated the father's consent. But the appellate court reversed, finding that application of the ICWA under these circumstances violated the Fifth, Fourteenth and Tenth Amendments.
To resolve the constitutionality issue, the Bridget R. court weighed the competing interests of the tribe, the parents and the children. In situations where the child and both parents have a social, political or cultural connection to their tribe, the court found that the act's goal of preserving tribal heritage is served, allowing the ICWA to meet constitutional muster. "However, where such social, cultural or political relationships do not exist or are very [*5]attenuated, the only remaining basis for applying ICWA rather than state law in proceedings affecting an Indian child's custody is the child's genetic heritagein other words, race." (Bridget R., supra, 41 Cal App 4th at 1508, 49 Cal Rptr 2d at 527.)
The court concluded that the act is unable to survive the strict scrutiny analysis triggered when there are race based classifications. The justices maintained that Indian children placed with adoptive families under the ICWA have a smaller pool of potential homes than do non-Indian adoptive children, while Indian children who are removed from non-Indian caretakers pursuant to the act are denied the stability of being raised in a single adoptive home. Under a constitutional analysis, according to Bridget R., these disadvantages can only be justified in instances where application of the ICWA furthers the act's goal of preserving Indian culturea requirement that is not met when the Indian family affected by the act has severed their ties to Indian culture. Noting that courts are required to construe statutes to uphold their constitutionality, the justices concluded that the ICWA must be interpreted as being consistent with the EIF doctrine.
Alexandria Y. largely followed the reasoning of Bridget R., but disagreed "with its holding that the doctrine cannot come into {**5 Misc 3d at 384}play unless the child and both his parents lack a significant relationship with Indian life . . . whether there is an existing Indian family is dependent on the unique facts of each situation." (Alexandria Y., 45 Cal App 4th at 1493, 53 Cal Rptr 2d at 686.)
Crystal R. also followed the holding of Bridget R., while emphasizing the "shifting balance of interests" (Crystal R., supra, 59 Cal App 4th at 719, 69 Cal Rptr 2d at 424) that gets played out under the ICWA:
"[T]he ICWA recognizes that the tribe's interest in child custody proceedings diminishes as the family's connections to the tribe become more attenuated . . . As the tribe's interest in the proceedings weakens, the state's interest in protecting the best interests of the child assumes more importance" (Crystal R., 59 Cal App 4th at 719-720, 69 Cal Rptr 2d at 424). 
"It ensures that a child's ties with his or her Indian parents and with the tribe are protected and preserved where such ties exist . . . In the absence of such ties, the doctrine ensures that the invocation of the Act's protections will not be abused and that state law will operate to protect the best interests of the child." (Crystal R., 59 Cal App 4th at 722, 69 Cal Rptr 2d at 426 [citations omitted].)
Courts which reject Bridget R. and its progeny give equal weight to the interests of the tribe, Indian children and their parents.
"The different treatment of Indians and non-Indians under ICWA is based on the political status of the parents and children and the quasi-sovereign nature of the tribe . . . We apply the rational basis test to [the] substantive due process and equal protection challenges, and we conclude ICWA is rationally related to the protection of American Indian families and tribes and is rationally related to the fulfillment of Congress's unique guardianship obligation toward Indians." (In re A.B., 2003 ND 98, 663 NW2d 625, 636 [2003].)
A similar rebuttal to a constitutional challenge to the ICWA was made in Matter of Adoption of Riffle (277 Mont 388, 922 P2d 510 [1996]). "[T]he principal purposes of the Act are to promote the stability and security of Indian tribes by preventing further loss of their children; and to protect the best interests of Indian children by retaining their connection to their tribes." (Matter of Adoption of Riffle, supra, 277 Mont at 393, 922 P2d at 514 [citation and internal quotation marks omitted].){**5 Misc 3d at 385}
But the reasoning of Bridget R.'s critics fails to recognize the "shifting balance of [*6]interests" (Crystal R., supra, 59 Cal App 4th at 719, 69 Cal Rptr 2d at 424) inherent in the ICWA. The stake tribes have in children born to parents disconnected from their Indian roots is less than the interest they have in children born to parents who have retained their Indian identity. This is so because losing a child born to parents involved in tribal life is, in effect, losing part of a family that the tribe needs to retain, if it is to extend its current level of cultural growth into the next generation. Conversely, relinquishing control over a child born to parents uninvolved in Indian life costs the tribe nothing in terms of maintaining a stable level of cultural growth. The goal of the ICWA, after all, is to promote the "stability" (25 USC § 1902) of Indian tribes, rather than to create a cultural windfall by giving them jurisdiction over children they would otherwise have no involvement with. I, thus, cannot find that the ICWA is rationally related to its goals in situations where there is no existing Indian family. As such, I adopt the reasoning of Bridget R. in regard to the EIF doctrine.
In finding the EIF doctrine necessary to uphold the ICWA's constitutionality, I reject the adoptive parents' contention that the ICWA only applies to involuntary child placements.
"[T]he application of the ICWA to voluntary private placement adoptions is not inconsistent with the purposes of the Act . . . The effect on both the tribe and the Indian child of the placement of the child in a non-Indian setting is the same whether or not the placement was voluntary. 
"Furthermore, the economic factors that led Congress to provide safeguards against induced voluntary relinquishments to state agencies are equally implicated in private placement adoptions." (Matter of Adoption of a Child of Indian Heritage, 111 NJ 155, 170, 543 A2d 925, 932 [1988]; see also, In re Custody of S.B.R., 43 Wash App 622, 625, 719 P2d 154, 156 [1986] [court rejects notion that the ICWA is inapplicable to intrafamily disputes].)
The argument made by the adoptive parents in this regard presents a false distinction, as the effect on the child and tribe in both voluntary and involuntary placements is the same.
I also reject the assertion that Social Services Law § 373 requires that the subject child be placed in a Jewish home. Social Services Law § 373 applies only to foster care placements. Either{**5 Misc 3d at 386} way, the placement preferences of the ICWA supercedes Social Services Law § 373 under the Supremacy Clause.
The tribe's motion to intervene under the ICWA, however, cannot be decided on the papers before me, as the facts are insufficiently developed. This case will be adjourned for a hearing, at which the tribe will have the burden of proving the existence of an Indian family by a preponderance of the evidence[FN2]

(see, Crystal R. v Superior Ct., supra). Should I find that the ICWA is inapplicable in the case at bar, I will, pursuant to Matter of Baby Girl S. (supra), permit the Tohono O'odham Nation to intervene under CPLR 1013. Such intervention would require a best interest hearing regarding the child's placement.
The adoptive parents' motion to disqualify the tribe's counsel, Ben Rosin, is denied for the reasons which follow.
"A party's entitlement to be represented in ongoing litigation by counsel of his or her own choosing is a valued right which should not be abridged absent a clear showing that [*7]disqualification is warranted . . . and the movant bears the burden on the motion." (Campolongo v Campolongo, 2 AD3d 476 [2d Dept 2003].) "A party seeking disqualification has the burden of establishing at the outset that an attorney-client relationship, or some other relationship giving use to an implied fiduciary obligation, arose." (New York Univ. v Simon, 130 Misc 2d 1019, 1022 [Civ Ct, NY County 1985].) In addition, the movant must "show the nature and substance of the confidential information . . . imparted to the attorney[ ], and its bearing on [this] proceeding." (Schneider v Saiber Schlesinger Satz & Goldstein, 260 AD2d 321 [1st Dept 1999].) And "[a] party's 'unilateral belief' that he is represented by counsel 'does not confer upon him the status of client unless there is a reasonable basis for his belief' " (Knigge ex rel. Corvese v Corvese, 2001 WL 830669, *3, 2001 US Dist LEXIS 10254, *8 [SD NY, July 23, 2001] [citation omitted]).
In his reply affirmation Mr. Rosin says that one of the adoptive parents called his office asking if he could represent him in the case at bar. Mr. Rosin was told that a guardian ad litem would be appointed and was given the name of the attorney who represented the biological parents when they gave their consents to the adoption. A fee amount was also discussed. In his {**5 Misc 3d at 387}affidavit in support of the motion to disqualify Mr. Rosin, one of the adoptive parents states that he called Mr. Rosin as part of his search for an attorney to represent him in this adoption litigation. The affiant goes on to say: "I told him about the Nation's opposition to our adoption, of our daughter's pending adoption before Judge Bednar . . . I told him how our son came to be placed in our care. I told him about our dealings with the birth parents, of our home and family . . ." (adoptive parent's affidavit at 3).
No matter which version of the facts is to be credited, the information supplied by the adoptive parent is insufficiently confidential to warrant disqualification. Not only is the information the adoptive parent claims he conveyed available in the court filewhich Mr. Rosin would have access to if the tribe is permitted to intervenebut, it has not been shown how the imparting of this information will effect this proceeding.
Moreover, it seems unreasonable for the movant to think that Mr. Rosin was representing him, during a discussion about retaining his services. (See, Knigge v Corvese, supra, 2001 WL 830669, *4, 2001 US Dist LEXIS 10254, *9-10.) The motion to disqualify the tribe's counsel is, thus, denied. (See, New York Univ. v Simon, supra [in holdover proceeding court denies motion to disqualify plaintiff's attorney since plaintiff, through discovery, could have gotten information revealed to attorney by defendant].)

Footnotes

Footnote 1: The mother has been a registered member of the tribe since 1982.

Footnote 2: I will apply Alexandria Y.'s standard for determining the existence of an Indian family. (Alexandria Y., supra, 45 Cal App 4th at 1493, 53 Cal Rptr 2d at 686.)